Submitted on record and brief November 2, 1977, affirmed as modified, remanded April 18, 1978

BEAL, *Appellant,*

*v.*

BEAL, *Respondent.*

(No. A-76-07-09929, SC 25319)

577 P2d 507

Robert H. Hollister, of Cramer & Cromwell, Portland, filed a brief for appellant.

No appearance contra.

HOWELL, J.

Linde, J., concurring in part, dissenting in part.

## HOWELL, J.

This is an appeal from a decree fixing the interests of the plaintiff, Raymond Beal, and the defendant, Barbara Beal, in a residence in Portland. The trial court found that the parties each owned an undivided one-half interest in the property. The plaintiff appeals.

As the Beals were not husband and wife at any time relevant to this suit, this is the first time this court has been asked to decide the principles to be applied in determining the property rights of the parties in property accumulated while they were living together unmarried.[1]

The parties were divorced in March, 1972. They entered into a land sale contract in April, 1972, to purchase the subject property for $22,500. The contract listed both parties' names as husband and wife. Raymond paid $500 of the $2,000 down payment and Barbara paid the balance of $1,500. The contract required monthly payments of $213.42, which included principal, interest and taxes. Barbara paid the first monthly payment, and Raymond has made all subsequent payments.

After the purchase, the parties lived together in the house. Raymond worked steadily and Barbara was almost constantly employed. They had a joint savings account but maintained separate checking accounts. The parties added shades, storm windows and carpeting, and remodeled the kitchen. Barbara paid some of the costs, and some were paid from the joint savings account. Barbara's income was used for family expenses.

After living together for two years, Barbara moved out and Raymond remained, and he has made all monthly payments on the house.

---

[1] In *Latham and Latham,* 274 Or 421, 547 P2d 144 (1976), we held that an express agreement between two unmarried parties to share equally in real and personal property accumulated during the period they were living together as husband and wife was not void as against public policy.

Historically, courts have been reluctant to grant relief of any kind to a party who was involved in what was termed a "meretricious" relationship. Courts took the position that the parties had entered into a relationship outside the bounds of law, and the courts would not allow themselves to be used to solve the property disputes evolving from that relationship. Generally, the parties were left as they were when they came to court, with ownership resting in whoever happened to have title or possession at the time. The rationale was predicated on public policy or even an invocation of the clean hands doctrine. In *Merit v. Losey,* 194 Or 89, 240 P2d 933 (1952), involving a similar situation, we stated:

"* * * The inclusion of defendant as a vendee in the contract was a matter which arose out of and as an incident of the unlawful and meretricious cohabitation of the parties, and the dilemma in which plaintiff now finds himself resulted from wrongdoing in which the parties were at least *in pari delicto.* Plaintiff, in seeking the aid of equity to extricate him from such a situation, does not come into court with clean hands, and equity will not aid him. * * *" 194 Or at 102-03.

While a majority of people still follow the marriage practice, many couples, both young and old, are living together without the benefit of a civil marriage.[2] These situations create inheritance problems, questions concerning the relationship between parent and child and, as in the instant case, difficulty in dividing property when the relationship terminates. The problem with the previous judicial approach is well stated by the specially concurring opinion in *West v. Knowles,* 50 Wash 2d 311, 311 P2d 689 (1957):

"The majority opinion indicates that for ten years Bonnie West and Delmer Knowles lived together and were generally accepted as a married couple. However, they had never observed the usual conventions of (a)

[2]We are compelled to recognize the fact that the number of parties participating in such relationships has increased greatly. It is reported that the number of cohabiting couples increased 700 percent from 1960 to 1970.

obtaining a marriage license and (b) formally exchanging marriage vows. Obviously, such a relationship is not generally approved by the mores of our society. It is not a relationship which is encouraged by the courts. Be that as it may, some of our citizens of the opposite sex occasionally become involved in a relationship such as that in the instant case.

"Not infrequently, through the individual or joint efforts of the parties, such a couple acquires or accumulates property. Friction develops, the parties quarrel, and finally they terminate the unconventional or so-called meretricious relationship. Thereupon, a decided difference of opinion arises between them as to the ownership of certain items of property. Occasionally, the parties bring their dispute to the courts, seeking an authoritative settlement. Under such circumstances, this court and the courts of other jurisdictions have, in effect, sometimes said, 'We will wash our hands of such disputes. The parties should and must be left to their own devices, just where they find themselves.' To me, such pronouncements seem overly fastidious and a bit fatuous. They are unrealistic and, among other things, ignore the fact that an unannounced (but nevertheless effective and binding) rule of law is inherent in any such terminal statements by a court of law.

"The unannounced but inherent rule is simply that the party who has title, or in some instances who is in possession, will enjoy the rights of ownership of the property concerned. The rule often operates to the great advantage of the cunning and the shrewd, who wind up with possession of the property, or title to it in their names, at the end of a so-called meretricious relationship. So, although the courts proclaim that they will have nothing to do with such matters, the proclamation in itself establishes, as to the parties involved, an effective and binding rule of law which tends to operate purely by accident or perhaps by reason of the cunning,

---

It is not confined to young couples; many of the elderly are using this form of relationship for economic reasons, including the fact that both may receive social security payments. Folberg & Buren, *Domestic Partnership: A Proposal for Dividing the Property of Unmarried Families,* 12 Will L J 453, 457 (1976).

anticipatory designs of just one of the parties." *West v. Knowles, supra* 50 Wash 2d at 315-16.

After departing from the position that the courts will not participate in making a division of property acquired during a meretricious relationship, the courts and the legal scholars have adopted or suggested various theories to provide relief.

One approach taken by the Washington Supreme Court in *In re Estate of Thornton,* 81 Wash 2d 72, 499 P2d 864 (1972), was to hold that where a man and woman had lived together in a close familial type relationship, their joint operations of a ranch created an implied partnership agreement. Another approach has been to use either a resulting trust, *see, e.g., Sugg v. Morris,* 392 P2d 313 (Alaska 1964); *Keene v. Keene,* 57 Cal 2d 657, 371 P2d 329, 21 Cal Rptr 593 (1962), or a constructive trust, *see, e.g.,* Folberg & Buren, *Domestic Partnership: A Proposal for Dividing the Property of Unmarried Families,* 12 Will L J 453, 472 (1976); Bruch, *Property Rights of De Facto Spouses Including Thoughts on the Value of Homemakers' Services,* Vol. X Fam L Q 101 at 125 (1976), to adjust the rights of the parties.

The authors of *Domestic Partnership,* in 12 Will L J 453, suggest that courts recognize the unique nature of property settlements between unmarried cohabitants and announce a separate set of equitable rules to deal with those problems. They go on to articulate a theory of domestic partnership based largely on principles of equity, which they believe will fairly settle this type of property dispute. Bruch, in *Property Rights of De Facto Spouses,* suggests that the intent of the parties ought to be the guideline for the court in such cases, to the extent that intent is discernible; to the extent it is not, courts should do equity.[3]

---

[3]In *Marvin v. Marvin,* 18 Cal 3d 660, 557 P2d 106, 135 Cal Rptr 815 (1976), the California Supreme Court held that the parties may agree to

Also, the regular rules of cotenancy provide an alternative approach. Plaintiff cites *Palmer v. Protrka,* 257 Or 23, 476 P2d 185 (1970), as authority for applying the regular rules of cotenancy. *Palmer* involved a property division in a partition suit. We do not believe *Palmer* is applicable for several reasons. It was a suit for partition, not a suit to declare the interests of the parties; the parties did not purchase the property as cotenants; and there was no marriage relationship between them, as Palmer acquired her interest from her former husband who was a tenant in common with Protrka. Further, and most importantly, Palmer and Protrka were not living together in a nonmarital situation.

Using the rules of cotenancy, when the conveyance is taken in both names the parties would be presumed to share equally, or to share based upon the amount contributed, if the contributions were traceable. *West v. Knowles, supra;* Freeman on Cotenancy 172, § 105 (1886). *See, e.g., Mayo v. Jones,* 8 Wash App 140, 505 P2d 157 (1972); *Huls v. Huls,* 98 Ohio App 509, 130 NE2d 412 (1954); *Williams v. Monzingo et al,* 235 Iowa 434, 16 NW2d 619, 156 ALR 516 (1944). Such rules of cotenancy could also result in requiring a showing of who paid various items, such as taxes, mortgage payments or repairs. 2 Tiffany, Law of Real Property 282, § 461 (1939). The difficulty with the application of the rules of cotenancy is that their mechanical operation does not consider the nature of the relationship of

pool their earnings and hold the property equally, separately, or in any manner they desire:

"A great variety of other arrangements are possible. The parties might keep their earnings and property separate, but agree to compensate one party for services which benefit the other. They may choose to pool only part of their earnings and property, to form a partnership or joint venture, or to hold property acquired as joint tenants or tenants in common, or agree to any other such arrangements. (See generally Weitzman, *Legal Regulation of Marriage: Tradition and Change* (1974) 62 Cal. L. Rev. 1169.)" 18 Cal 3d at 674, fn. 10.

[ 121 ]

the parties. While this may be appropriate for commercial investments, a mechanistic application of these rules will not often accurately reflect the expectations of the parties.

■ We believe a division of property accumulated during a period of cohabitation must be begun by inquiring into the intent of the parties, and if an intent can be found, it should control that property distribution. While this is obviously true when the parties have executed a written agreement, it is just as true if there is no written agreement. The difference is often only the sophistication of the parties. Thus, absent an express agreement, courts should closely examine the facts in evidence to determine what the parties implicitly agreed upon. *See, e.g., Marvin v. Marvin,* 18 Cal 3d 660, 557 P2d 106, 135 Cal Rptr 815 (1976); *Tyranski v. Piggins,* 44 Mich App 570, 205 NW2d 595 (1973). *See generally,* Bruch, *supra* X Fam L Q at 134-35; Folberg & Buren, *supra;* Comment, *Illicit Cohabitation; The Impact of the Vallera and Keene Cases on the Rights of the Meretricious Spouse,* 6 UCD L R 354 (1973); 48 Wash L R 635 (1973).

More often than not, such an inquiry will produce convincing evidence of an intended division of property, but we recognize that occasionally the record will leave doubt as to the intent of the parties. In such cases, inferences can be drawn from factual settings in which the parties lived. Cohabitation itself can be relevant evidence of an agreement to share incomes during continued cohabitation. Additionally, joint acts of a financial nature can give rise to an inference that the parties intended to share equally. Such acts might include a joint checking account, a joint savings account, or joint purchases.

Here, the record supports the position that the parties intended to pool their resources for their common benefit during the time they lived together. This conclusion is supported by the defendant's testimony that she contributed her entire income to

maintenance of the household. Further, she testified that she gave money on one occasion to the plaintiff to make the house payment. Neither party made any effort to keep separate accounts or to total their respective contributions for reimbursement purposes, and, although they had separate checking accounts, they had a joint savings account. Finally, the living arrangement itself is evidence that the parties intended to share their resources. Since the parties intended to pool their funds for payment of their obligations, they should be considered equal cotenants, except that Barbara is entitled to an offset of $500, representing the amount she paid over and above one-half of the down payment.

In summary, we hold that courts, when dealing with the property disputes of a man and a woman who have been living together in a nonmarital domestic relationship, should distribute the property based upon the express or implied intent of those parties.

In the instant case, the trial court found that both parties should have an undivided interest in the property. We believe that the parties should stand on an equal basis during the time they were living together, except that fairness dictates that Barbara should receive credit for the $500 additional she paid on the down payment.

However, a different situation exists after Barbara moved out of the residence in June, 1974. Raymond has continued to live in the house and has paid $7,469.70 in house payments from then until the time of trial, and he is continuing to make those payments. Since June, 1974, the parties have lived apart, maintained independent households, and have not contributed to each other's maintenance.

Since the parties have not lived together since June, 1974, their property rights after that date should be determined by the regular rules of cotenancy. As such, Barbara is obligated to reimburse plaintiff

for 50 percent of the house payments made by him after June, 1974. 2 Tiffany, Law of Real Property § 459 (3d ed 1977); *Palmer v. Protrka, supra.*

The question of whether the defendant is entitled to recover the reasonable rental value is also raised.[4] Normally, cotenants cannot charge one another for occupancy of the property in which they are part owners. This rule is subject to an exception when one cotenant's use of the property in fact excludes the other cotenant's use and enjoyment of it. *See Hanns v. Hanns,* 246 Or 282, 310, 423 P2d 499 (1967); *Palmer v. Protrka, supra;* 2 Tiffany, *supra,* § 450.

Here, as in *Palmer,* the relationship of the parties was such that it apparently would have been impractical for the defendant to occupy the premises while the plaintiff was living there, and thus she is entitled to one-half of the fair rental value from June 1, 1974. Because the trial court made no findings on the issue of rental value and because no evidence was introduced on that point, we must remand the suit to the trial court.

Affirmed as modified, and remanded.

**LINDE, J.,** concurring in part and dissenting in part.

Because of the contemporary interest in the practice of cohabitation without marriage, this case risks being read for more than, on its facts, it actually decides. For that reason, it is important to separate the precise question being decided from dicta that range beyond this case and may or may not fit future cases.

The facts are simple and probably not very typical of other cases. Plaintiff and defendant, who had been divorced, later contracted to buy a house in which they lived together for about two years. At that time,

---

[4]The trial court found that Raymond owed Barbara for her share of a reasonable rental value of the property. No evidence on that amount was introduced.

defendant moved out. Plaintiff, who remained in possession, brought this suit for an equitable determination of the respective rights of the parties to their interest in the real estate contract. Each party had made some financial contribution to the purchase, one primarily to the down payment, the other to the monthly payments. These amounts were far from equal, but defendant also asked to be credited for other contributions made to the joint household to balance the payments plaintiff made on the house.

It should be understood how little is presented in this appeal and how much is not before us. The case does not involve a legal title to the real property but only the determination of the parties' shares in the equity. It does not involve the obligations of each of these parties to continue payments under the purchase contract or other possible rights of third parties. The value of the equity itself is unknown. The questions how it might be divided, whether one party should buy out the interest of the other and if so, at what price, or any other claim for relief were not presented by the pleadings and the trial court declined to anticipate them. On this appeal, we have a 10-page brief by plaintiff, no response by defendant, and no oral argument. The broader issues were not addressed by the parties or by the trial court and have not had the benefit of briefing and argument even as applied to the present facts, let alone the range of highly diverse situations in which they might arise. Under the circumstances this case cannot be a reliable guide to such other situations.

What the court holds is that the relative rights of the parties in their common interest in this property depends on their intent and that this intent is to be determined from any written instrument or such other evidence of an express or implied agreement as may be available. In this case, both a written instrument and other evidence is available. The parties chose to describe their interest in the purchase contract itself

as being that of "husband and wife." Also, plaintiff himself alleged in his complaint that the parties held themselves out to be husband and wife and bought the house as such, though they were divorced. One could hardly ask for stronger evidence of an intent, as between these parties, to acquire this home upon the assumptions and expectations as to their relative rights that apply to a husband and wife, and plaintiff is in no position to complain if the division of their interest upon a separation also takes into account factors similar to those that would be applied between spouses rather than between arm's-length investors in real property.

It is important, however, that this result follows from the well-documented *agreement* of the parties to treat their purchase as one by "husband and wife," rather than as one implied by law from the circumstances of cohabitation. The evidence fixes this particular intention of these parties with respect to this property, but there is no reason to believe that the same principles of giving effect to the mutual intention and expectations of the parties would not apply equally between parties who were acquiring and sharing household property without cohabiting sexually[1] or for that matter without living together at all. The court implies as much in recognizing that mechanical application of the rules of cotenancy along purely financial lines may fit commercial investments but often will not reflect accurately the shared expectations of parties in other relationships, and that cohabitation can be one item of evidence (though by itself perhaps too inexplicit)[2] of those shared expectations.

[1] Indeed, while one may well infer that plaintiff and defendant did so, there is no direct evidence to that effect, and it would surely have been both legally irrelevant and improper to examine the parties on that question as an element in a determination of their property rights.

[2] In fact, whatever else may be true of the intentions and expectations of unmarried couples (if these are shared at all) the one thing that may often be inferred with some certainty is that they have chosen *not* to be married and to place themselves within the legal consequences of that relationship.

Similarly, the titles of articles cited in the opinion refer alternatively to "de facto spouses" and to "domestic partnerships," and the court does not purport to distinguish these. Really the only relevance that the nature of the parties' nonmarital cohabitation has to this decision is the preliminary question of the "nonjusticiability" of disputes in a "meretricious relationship," which we dispose of in the opening pages of the opinion. If it were otherwise and the case involved some special rule for property rights in "nonmarital cohabitation," this decision would come close to backing the state into a version of "common-law marriage" that has in the past and should in the future be left to legislation. *See* Or Gen Laws 1925, ch 269, *repealed by* Or Gen Laws 1929, ch 149; *cf. Wadsworth v. Brigham,* 125 Or 428, 259 P 299 (1927), *aff'd on rehearing,* 266 P 875 (1928); *Huard v. McTeigh,* 113 Or 279, 232 P 658 (1925).

I have some doubts about the court's disposition of several of the specifics in this case, such as the imposition of rental payments by plaintiff to defendant in the absence of any claim or evidence in the record that defendant's choice to be the one to leave was in any way attributable to plaintiff, but since on the basis of the parties' own agreement the court is unsnarling their mutual rights in the purchase contract more like those of spouses than of cotenants, I shall not pursue these specifics here.