Argued and submitted November 14, 1980, reversed and
remanded with instructions April 27, 1981

IRELAND,

*Appellant,*

*v.*

FLANAGAN,

*Respondent.*

(No. A7812-20671, CA 17050)

627 P2d 496

Lawrence B. Hunt, Portland, argued the cause for appellant. With him on the briefs was Becker, Sipprell & Hunt, Portland.

Carol Wright, Estacada, argued the cause for respondent. With her on the brief was Terrance McCauley, Estacada.

Before Joseph, Presiding Judge, and Warden and Warren, Judges.

WARREN, J.

## WARREN, J.

Plaintiff brought this suit in equity seeking: (1) an award of a one-half interest in a house held in the name of defendant and occupied by the parties during the period of their relationship; and (2) an accounting from defendant for her exclusive use of the property from the time the parties ceased living together. The basis of her complaint was that the parties, during their period of cohabitation, had an express oral agreement whereby they agreed to pool all of their assets for their joint benefit. Defendant generally denied plaintiff's allegations and counterclaimed for payment of plaintiff's share of certain debts, which were allegedly jointly incurred during their relationship, and for recovery of an article of defendant's personal property. The trial court denied any relief; only plaintiff appeals.

The facts of this case are sharply contested. Regarding the parties' financial arrangement, plaintiff testified:

"A   After we moved in together, we sat down and discussed financial things and decided, for convenience sake and because, in essence, we were going to have a long relationship together and a marriage, we would pool our resources.

"Q   Did you expressly agree in those terms?

"A   Yes, we did.

"Q   What did you mean by pooling your resources?

"A   Whatever I had was hers; whatever she had was mine. And that included money, cars, furniture, whatever it was."

In obtaining the $7,000 down payment for the purchase of the house, plaintiff testified that defendant secured a $5,000 loan from her credit union and plaintiff sold her automobile for $2,000.

On direct examination, plaintiff testified that they planned to purchase the house in both names if at all possible and that it was not until they went to sign the closing papers at the escrow office that they discovered that both names did not appear on the contract. Nevertheless, they decided that defendant should sign the papers as written and that they would be corrected at another time. Thereafter, the parties on numerous occasions discussed

changing title to both names, but, as plaintiff put it, they "never got around to doing it." On cross-examination, however, an excerpt from plaintiff's May 14, 1979, deposition was read into the record in which plaintiff had testified that, near to the time they purchased the house, they decided to take title solely in defendant's name in order to provide her with a tax shelter for her higher wages.

Defendant's testimony regarding the nature of the parties' agreement as to the house was punctuated with inconsistencies. The essence of her testimony was that the parties had an express oral agreement to pool their resources, each paying 50 percent of everything, and if plaintiff contributed her 50 percent of the house payments, then when the house was sold, plaintiff would get 50 percent of the equity. At one point in her testimony, defendant admitted that plaintiff had contributed $2,000 from the sale of plaintiff's automobile toward the $7,000 down payment on the house; at another point, defendant stated that plaintiff had contributed nothing to the house and that the automobile which allegedly was sold by plaintiff for her $2,000 contribution was not owned by plaintiff, but by defendant.

Several witnesses, including mutual friends of the parties, the escrow agent who prepared the papers on the house and the seller of the house, corroborated plaintiff's testimony that the parties bought the house together. One witness testified that defendant had expressly stated that the house was owned by both parties and that, in the event plaintiff's and defendant's relationship terminated, the house and other jointly-owned property would "be split right down the middle."

Both parties testified to the fact that they maintained a joint checking account, a joint savings account and a safety deposit box and that they had joint loans and two joint credit cards. They testified that their practice was to deposit their paychecks into their joint checking account and from this account to pay their bills, including the house payment. Defendant, moreover, admitted that plaintiff had in fact made most of the numerous, substantial household improvements plaintiff had claimed.

Upon the termination of their relationship, defendant moved out of the house in August, 1978. However, in October, 1978, defendant returned after plaintiff had vacated the premises.

The trial court made findings of fact: (1) both plaintiff and defendant are unreliable witnesses whose testimony is false in parts and is unreliable in parts unless corroborated by other evidence; (2) they agreed to pool their assets for their joint use during the period of their relationship, which terminated on August 31, 1978; (3) on about March 1, 1977, defendant purchased a house and assumed the mortgage; (4) plaintiff contributed $2,000 toward the total down payment for the property of $7,000; (5) pursuant to their agreement the property was used by the parties jointly during their relationship; (6) plaintiff occupied the premises with defendant until August 31, 1978; (7) during her occupancy, plaintiff expended some labor in improvements to the premises and some money was jointly expended by the parties for materials and labor for these improvements; (8) debts for these improvements were incurred in the name of defendant only; and (9) the relationship of the parties, as construed by the parties themselves, imposed upon them a moral obligation to provide for the other, similar to the relationship of husband and wife.

The trial court concluded that the law presumes that plaintiff's contributions toward defendant's purchase and improvement of the residence were gifts from plaintiff to defendant; that this presumption may be overcome only by evidence of the most convincing and satisfactory kind; that plaintiff's evidence failed to overcome the presumption of a gift; that plaintiff did not sustain her burden of proving that defendant promised to convey any legal or equitable interest in said real property to plaintiff, other than the right to use the property jointly with defendant during the time of their relationship; that defendant is not estopped to deny plaintiff's claims; that defendant is not legally required to account to plaintiff for her use of the property after the termination of their relationship; and that plaintiff does not owe defendant any of the sums alleged in defendant's counterclaims. Thereupon, the court denied relief to either party.

**1-3.**    Although the trial court held that plaintiff failed to overcome the legal presumption that her contributions toward the purchase and improvements to the house were gifts from plaintiff to defendant, neither party pleaded or argued that plaintiff's contributions were gifts. Instead, this theory was proffered gratuitously by the trial court. It has no applicability here. The general rule is, rather, that a party seeking to establish the existence of a gift must prove its existence by clear and convincing evidence. *Carpenter v. Carpenter,* 153 Or 584, 601, 602, 56 P2d 305, 57 P2d 1098, 58 P2d 507 (1936). An exception applies when there is a transfer of property from a parent, or one standing *in loco parentis,* to a child; such a transfer is presumptively a gift. *Ingersoll v. Ingersoll,* 263 Or 376, 379, 502 P2d 598 (1972). There is obviously no parent/child relationship here, and defendant's argument that *in loco parentis* cases are applicable is unpersuasive.

In untangling the affairs of the parties and effecting a division of assets and liabilities between cohabitants, the paramount question is to discern the intent of the parties. As the Supreme Court stated in *Beal v. Beal,* 282 Or 115, 122, 577 P2d 507 (1978):

> "We believe a division of property accumulated during a period of cohabitation must be begun by inquiring into the intent of the parties, and if an intent can be found, it should control that property distribution. While this is obviously true when the parties have executed a written agreement, it is just as true if there is no written agreement. The difference is often only the sophistication of the parties. Thus, absent an express agreement, courts should closely examine the facts in evidence to determine what the parties implicitly agreed upon. *See, e.g., Marvin v. Marvin,* 18 Cal 3d 660, 557 P2d 106, 135 Cal Rptr 815 (1976); *Tyranski v. Piggins,* 44 Mich App 570, 205 NW2d 595 (1973). *See generally,* Bruch, *supra,* X Fam L Q at 134-35; Folberg & Buren, *supra;* Comment, *Illicit Cohabitation; The Impact of the Vallera and Keene Cases on the Rights of the Meretricious Spouse,* 6 UCD L R 354 (1973); 48 Wash L R 635 (1973)."

The parties in *Beal* purchased a house after they were divorced. The purchase contract listed both parties' names and as husband and wife. Mr. Beal paid $500 of the $2,000 down payment and Mrs. Beal paid the balance of

$1,500. While she paid the first monthly payment, he made all subsequent payments. After the purchase, the parties lived together in the house. They maintained a joint savings account, but had separate checking accounts. They made improvements to the property, paid for in part by Mrs. Beal and in part from their joint savings account. Family expenses were paid from Mrs. Beal's income. Mrs. Beal moved out of the house after they had lived together for two years. Mr. Beal remained and paid all monthly house payments.

The Supreme Court concluded:

"[T]he record supports the position that *the parties intended to pool their resources for their common benefit during the time they lived together.* This conclusion is supported by the defendant's testimony that she contributed her entire income to maintenance of the household. Further, she testified that she gave money on one occasion to the plaintiff to make the house payment. *Neither party made any effort to keep separate accounts or to total their respective contributions for reimbursement purposes,* and, although they had separate checking accounts, they had a joint savings account. Finally, the living arrangement itself is evidence that the parties intended to share their resources. Since the parties intended to pool their funds for payment of their obligations, they should be considered equal cotenants, except that Barbara is entitled to an offset of $500, representing the amount she paid over and above one-half of the down payment." *Beal v. Beal, supra,* 282 Or at 122-23. (Emphasis supplied.)

■ Similarly, in the present case we find that during the parties' relationship they intended to pool their resources for their mutual benefit. In purchasing the house, the parties intended joint ownership. Title was taken in defendant's name for the sole purpose of providing her with a tax shelter. Thus, we conclude that the parties should be considered equal co-tenants. Although the parties here are members of the same sex, we believe that the principles articulated in *Beal* are equally applicable. *See Beal v. Beal, supra,* 282 Or at 124-27 (Linde, J., concurring in part and dissenting in part). Because defendant contributed an amount greater than one-half of the down payment, she is entitled to an offset of $1,500.

■    As in *Beal,* we further find that since October 1, 1978, plaintiff has not contributed toward the house payments. Therefore, defendant is entitled to reimbursement by plaintiff for 50% of the house payments made by defendant after October 1, 1978. *Beal v. Beal, supra,* 282 Or at 123-24. Moreover, because defendant's occupancy of the property excluded plaintiff's use and enjoyment thereof, plaintiff as a co-tenant is entitled to recover one-half of its fair rental value from October 1, 1978. The evidence was that the fair rental value of the property as of August 1, 1978, was $275 per month and that its fair rental value as of August 1, 1979, was $325 per month. Plaintiff is entitled to recover from defendant one-half of the reasonable rental value of the premises, less a credit of $1500 and a credit for one-half of the mortgage payments made by the defendant since October 1, 1978.

Reversed and remanded for entry of a decree in conformity with this opinion.