Argued and submitted June 7, affirmed on appeal and on cross-appeal
September 11, 1991

Christine N. SHURALEFF,
*Appellant - Cross-Respondent,*

*v.*

Thomas J. DONNELLY,
*Respondent - Cross-Appellant.*

(16-89-00354; CA A64343)

817 P2d 764

Donald K. Armstrong, Eugene, argued the cause for appellant - cross-respondent. With him on the brief was Armstrong, McCullen & Philpott, P.C., Eugene.

Diane M. DePaolis, Eugene, argued the cause for respondent - cross-appellant. With her on the brief was DePaolis, Evans, Shepard & Vallerand, Eugene.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

ROSSMAN, J.

## ROSSMAN, J.

In this action arising after the breakdown of a 14-year nonmarital domestic relationship, both parties appeal the trial court's division of property. We affirm on the appeal and on the cross-appeal.

The parties met in June, 1973, when plaintiff rented a room in defendant's residence in Fall Creek. Within a short time they began an intimate relationship and lived together until January, 1989. At the time the relationship began, plaintiff had between ten and fifteen thousand dollars and defendant owned the Fall Creek property, which consisted of five acres and a log house. In 1975 the log house burned and defendant built a cabin, which the couple used as a residence.

In September, 1975, the parties decided to purchase a contiguous 10-acre parcel for $15,000. Defendant gave the residence property to plaintiff to use as collateral to obtain a $9,000 loan for the down payment.[1] After a flood destroyed a log bridge connecting the properties, defendant installed a permanent bridge, made of steel railroad cars. In about 1980, they began to develop the property as a holly farm. In 1984, they purchased 17 acres down the road from the residence. They developed it also as a holly farm and installed a mobile home for use as a rental. In 1978, they purchased a rental house in Eugene, which they still owned at the time the relationship ended.

The deed to the Eugene rental property, and to two other properties sold before the relationship ended, were in the names of the parties as "husband and wife." In 1987, the parties executed various deeds that put the residence property, the two holly farm properties and the Eugene rental house in both names with right of survivorship but without reference to the parties as husband and wife.

During the relationship, plaintiff worked as a teacher and consultant in the Eugene school system. She attended graduate school and earned one master's degree and had over 90 hours towards a second. Defendant built modular

---

[1] Plaintiff testified that a business relationship was formed at that time. She stated that she "took the gift as an act of love and used it as a basis of a business partnership."

homes, did tree-thinning and, from 1977 to 1987, worked for Senco, a company that sold and serviced staple and nail guns. During that time, each earned approximately $30,000 a year. In 1987, rather than transfer out of the area, defendant left his job and, for over a year, constructed a new home for the parties on the residence property, drawing unemployment benefits for part of the time. In the fall of 1988, he cashed in his IRA and withdrew savings that had been in his name alone and began a business similar to that of Senco which had a value of $22,500. When the parties separated in January, 1989, plaintiff, in her name alone, had annuities, cash accounts, and a PERS account with a total value of $180,865.[2]

The leading case in Oregon on property division after the breakdown of a nonmarital domestic relationship is *Beal v. Beal,* 282 Or 115, 577 P2d 507 (1978), which held that

"courts, when dealing with the property disputes of a man and a woman who have been living together in a nonmarital domestic relationship, should distribute the property based upon the express or implied intent of those parties." 282 Or at 123.

Plaintiff argues that this relationship was a "business" relationship and that, under *Beal,* the only property subject to distribution is the real property held in joint names. She argues that the evidence shows that the parties intended to share those properties, because both names are on the deeds and because they divided the expenses for the property. She contends that the evidence shows that they did not intend to share individually-held assets, because they divided the monthly living expenses, did not file joint income tax returns and never had joint bank accounts or charge accounts.

Defendant argues that Oregon courts have not considered property division after a long-term nonmarital relationship, and that the evidence shows that the assets here were no longer individualized. He argues that it is no more appropriate to say that he owns the irrigation pipe because he bought and installed it than to say that plaintiff owns her tax sheltered annuity because the income was held out of her salary. He contends that to accept plaintiff's position would

---

[2] Two of plaintiff's accounts and her PERS account were legally required to be in her name alone. Defendant was beneficiary of her PERS account.

result in her receiving $231,030 and his receiving $72,665 after 14 years of cohabitation and mutual contribution. He urges that that result would unjustly enrich her and would ignore the huge financial benefit she reaped from his initial contribution of property and his labor in developing the farm properties, building the bridge and residence and maintaining the rental properties.

The trial court issued a five-page letter opinion expressing its dissatisfaction with the "somewhat mechanical approach" of this court's cases which have cited *Beal*. It noted that neither *Beal* nor the later cases involved facts similar to this long-term domestic relationship and concluded that it would divide the property on the principle of what is "just and equitable after considering all relevant factors." It awarded plaintiff the liquid accounts and the rental residence with a total value of approximately $190,000. It awarded defendant the business he had started, the residence and the two farm properties for a total value of approximately $114,000.

The trial court noted that the principle of "just and equitable" distribution is incorporated into dissolutions of marriage by ORS 107.105 and stated that it was mindful of "converting Oregon to a common law marriage state by the back door." It specifically rejected any use of presumptions that flow from the concepts of short- and long-term marriages but was persuaded that an equitable division was required to recognize the change in social norms since the *Beal* decision. It was influenced by the rationale of Washington decisions:

> " 'A court could ascertain whether there exists a long-term, stable, nonmarital family relationship. Such relevant factors include continuous cohabitation, duration of the relationship, purpose of the relationship, and the pooling of resources and services for joint projects. If a relationship exists, it is reasonable to assume that each member in some way contributed to the acquisition of the property. A court could then examine the relationship and the property accumulations and make a just and equitable disposition of the property. * * * A joint and equitable disposition of property entails considering the 'respective merits of the parties, through whom the property was acquired, monetary and labor contributions, whether or not children were born of the relationship and who is to care for them, and the general

condition in which the termination of the relationship will leave each of the parties.' [*Latham v. Hennessey,* 87 Wash 2d 550, 554, 554 P2d 1057.]" *Warden v. Warden,* 36 Wash App 693, 697, 676 P2d 1037, 1039 (1984).

Although both *Beal* and this case deal with the general question of division of property in a nonmarital relationship, we agree with the trial court that this case can not be shoe-horned into the one-sentence holding from *Beal.* In his dissenting and concurring opinion, Judge Linde admonished that *Beal* should not be read for more than it decides on its facts and should not be held to involve "some special rule for property rights in 'nonmarital cohabitation' * * *." 282 Or at 127. The *Beal* facts were a nonmarital domestic relationship of two years during which the parties cohabited in the residence the ownership of which was in dispute. The intent of the parties was clearly to acquire the home with the relative rights that apply to husband and wife. We do not believe that, under these dissimilar facts, the holding in *Beal* precludes a court of equity from resolving a nonmarital property division by considering the equitable principles underlying the *Beal* holding.

The Supreme Court arrived at its holding in *Beal* only after making the equitable determination that Oregon courts would not deny relief in nonmarital relationships despite the historical refusal of courts to do so. In so concluding, the court rejected legal theories that divide property mechanistically without recognition of the unique nature of a domestic relationship. 282 Or at 122.

Despite plaintiff's attempt to characterize the relationship here as only a "business" one, it was a domestic one. The parties had an intimate relationship and lived together for 14 years. Although plaintiff claimed that she and defendant strictly accounted each month for individual expenses, the evidence shows that, over the years, accounts were often muddled with both parties making trade-offs.[3] Furthermore,

---

[3] Plaintiff testified:

"A. Well, as you heard us both testify, monthly we would sit down when it came time to do the bill paying and square our accounts at that time. We always felt it was fair and equitable.

"If he had more on the rentals that month and I had more on, you know, bought a riding lawn mower or something, and I bought like 15 shovels and hoes

in this so-called "business" relationship, neither party assigned a value to the other's labor. Plaintiff's strengths were primarily in investment and management. Defendant used his physical skills and knowledge of construction to construct the homes and the bridge and to improve the properties. Each party recognized the contributions of the other.[4]

The relationship evolved, as domestic relationships do, with exchanges of ideas as to how the parties would spend the future. Plaintiff admitted to "dreams" of how they might spend retirement. They discussed options as to the best investments to realize their dreams. Together they rejected planting the farm properties in Christmas trees, because they wanted a crop that would provide a "yearly" income. The winter harvest of holly would leave summers free to travel. The holly business was a long-term investment; the first crop was still three or four years away at the time of trial. The future that they contemplated included continuing the domestic relationship.[5] Both were involved in planning the residence that defendant built to replace the cabin.

---

and everything around the house. It equaled up."

[4] For example, plaintiff testified:

"Q. Did you have any kind of understanding in those early years, '74 and '75 as to how the actual expenditures would be split between you?

"A. At that point I didn't weigh and measure anything. When he did work around the house or when he fixed my bedroom, I felt my paying for his living expenses was for his labor so I always felt it was a fair exchange and I also knew that if he felt it wasn't a fair exchange, I would know that and so it was — we did not discuss it at that time, no.

"* * * * *

"A. Well, what I would try and do is have him make a contribution. It was never 50-50 but I always felt his labor was helping our joint properties so I would try and assist him for some living expenses on months when he didn't have the money to pay back. I would, I mean, we didn't always — we didn't always tally up every month."

[5] The trial court so found:

"From time to time over the years, the parties did have discussions regarding retirement.together and retirement activities - travel, etc. While the evidence does not support a finding that they formulated a specific, detailed plan regarding how to finance this retirement, there were discussions regarding investments she began in the early 1980's and the potential proceeds from the holly farming operations, and he at least thought they were working together toward a common goal."

■　　We conclude, as did the trial court, that the division of property here should recognize the parties' efforts over 15 years of cohabitation to build a future together based on the contributions of both. That can be accomplished only by including assets held in each party's name alone. As the trial court succinctly stated:

"Economically, the parties' relationship has been symbiotic and I doubt very much that either, acting alone, would have accumulated what they will receive under this decision."

We do not agree with plaintiff that this conclusion requires overruling *Beal,* which we are not at liberty to do.[6] Our holding arises from the inference from the factual settings in which the parties lived. *Beal v. Beal, supra,* 282 Or at 122. It incorporates the basic premise of *Beal* that one reason for providing relief in these disputes is to prevent the party with title, or in possession of property, from enjoying ownership without consideration of the contribution of the other party. Awarding property to the one with title had been the rule in cases where courts refused to act in nonmarital relationships. That rule often resulted in advantage to the party who was more cunning or shrewd. 282 Or at 119. The same result would obtain here.

Defendant had virtually no skills in managing money and was unquestioning in plaintiff's management. Defendant testified that there were general discussions about savings and investments and the use of them for retirement. He knew that plaintiff was saving money and that the accounts were in her name but testified that he thought that all the property was "just one pot."[7] Plaintiff gave him no details of her

___

[6] We also do not conclude that our determination overrules our earlier decisions, none of which involved a long-term relationship with plans for retirement. *See, e.g., Rissberger v. Gorton,* 41 Or App 65, 597 P2d 366 (1979).

[7] Defendant testified:

"A. Well, I did not mind paying a lot more money than Chris towards maintenance of rentals because she was saving money for us too. I mean, sort of taking money out of the left hand to the right hand. Just no purpose in it.

"I just did what needed to be done to make things work.

"Q. Was she aware that you were buying these materials and making these expenditures?

"A. Oh, yes, uh-huh.

"Q. Were you aware that she was saving money?

accounts, keeping her papers in a locked file box in a cedar chest under clothes. Defendant was unaware of the box and did not open her mail. Plaintiff told the parties' accountant to keep her financial information confidential from defendant. On these facts, a mechanistic application of *Beal's* language regarding "intent" would reward plaintiff, despite her failure to make it clear to defendant, in the face of his belief in their common goal, that she was subtracting her investments from that endeavor. In effect, the result would be the same as if the court had refused to act at all, the position rejected by the *Beal* court.

■ We do not hold that, after a long-term nonmarital relationship, property in one name only must always be divided. We are also cognizant that we must not convert Oregon "to a common law marriage state by the back door." Couples who choose to live together without marriage also choose not to avail themselves of the benefits society gives to, and burdens it imposes on, married people, one of which is the statutory protection of the presumption of equal contribution in the acquisition of property. Nonetheless, this is a proceeding in equity arising out of the breakdown of a domestic relationship. An equitable resolution cannot be reached without consideration of the "unique" and "symbiotic" nature of that relationship.

■ We do not agree with plaintiff that the trial court erred in the manner of its distribution of property and that it should have ordered a sale of the real property with the net proceeds to be divided. The distribution disentangles the affairs of the parties, recognizes the individual skills of each, and provides plaintiff a residence. We also find no error in the denial of damages for the reasonable rental value of the property during the time defendant was in sole possession. We agree with the trial court's conclusion that any rental value is offset by expenses, paid by defendant, such as for finishing the home, and for back taxes.

On cross-appeal, defendant argues that the trial court should have awarded each party his or her initial contribution and then divided the remaining assets in half. The trial court's division of property not only recognizes the

---

"A. Oh, yes. Of course."

abilities of each party, but also recognizes plaintiff's aggressive role in the acquisition of the additional farm properties. We decline to disturb the distribution.

Affirmed on appeal and on cross-appeal.