Argued and submitted September 10, 2008, affirmed February 11, 2009

In the Matter of
the Domestic Partnership of

Jan Elaine BRANAM,
*Petitioner-Respondent,*
*and*

Randy O'Neil BEAVER,
*Respondent-Appellant.*

Josephine County Circuit Court
05DR0404; A133414

202 P3d 886

Clayton C. Patrick argued the cause and filed the briefs for appellant.

Frank C. Rote, III, argued the cause for respondent. With him on the brief was Brown, Hughes, Bird, Rote & Brouhard, LLP.

Before Armstrong, Presiding Judge, and Haselton, Judge, and Rosenblum, Judge.*

ARMSTRONG, P. J.

---

\* Haselton, J., *vice* Edmonds, J.

**ARMSTRONG, P. J.**

Randy Beaver appeals a judgment in an action to dissolve his domestic partnership with Jan Branam. In its judgment, the court gave each party an equal share of the appreciated value of the home in which the parties had lived, but it reimbursed to Branam the money that she had paid to purchase the home. Beaver contends that the court erred in reimbursing the purchase price to Branam. He also assigns error to the court's refusal to admit into evidence a letter that Branam's attorney sent to Beaver on the sale of the home. For the reasons explained below, we affirm.

Branam and Beaver moved to Oregon from California in 1996 after the death of Branam's husband, Jim. Beaver had been the captain of a fishing boat owned by Jim, and Branam and Beaver began seeing each other socially after Jim's death.

Beaver first earned his captain's license to operate ocean-going vessels in 1987. Beaver testified that, to receive his license, he "had to put in 100 days on the ocean minimum, * * * [get] six other captain's signatures * * * and * * * take a two and a half day [C]oast [G]uard exam, which consists of about five or six different types of things; navigations skills, all kinds of stuff." Beaver earned his livelihood working on the ocean, and his captain's license allowed him to "go anywhere up and down the coast and get a job. That license is good for 200 miles off shore anywhere in the world." According to Beaver's testimony, a captain's license is not necessary for a person to operate commercial fishing vessels, but it is necessary in order to carry members of the public on a vessel. Beaver earned approximately $35,000 per year as a fishing-boat captain. He testified that, if he gave up his captain's license and later sought to have it reinstated, he would have to start over and fulfill all of the requirements anew.

Accordingly, when the parties discussed moving to Oregon and away from Beaver's work as a boat captain in California, Beaver sought assurances from Branam that he would not be "out on the street in a month, in a year, 10 years, 20 years[.]" "If I was going to give all that up and move up here I wanted to make sure that I was going to basically have something." He testified that "I told her I didn't want to move

up here unless I got * * * my name on the house to make sure that I at least had a place to live," and that Branam had told him she had "enough money invested [that] we'd never have to work again."

Branam inherited some $500,000 from her husband's estate. She used roughly $170,000 of those funds to purchase a home in Cave Junction, and she put Beaver's and her names on the title to the home. The deed that conveyed the property conveyed it to Branam and Beaver, "not as tenants in common, but with the right of survivorship[.]" Branam testified, "I purchased the house, and his name was on it. I thought we would jointly take care of the house, and then if something happened to me, he'd have at least a place to live." When asked if she had intended to give Beaver the money that she had used to purchase the home, Branam answered, "No." Beaver testified that he understood "that if my name was on * * * the house, half the house belonged to me." Branam and Beaver did not discuss what would happen to the home if they separated; Beaver just said he wanted his name on it in the event that something happened to Branam or Branam died.

With his name on the title to the parties' home, Beaver moved to Oregon with Branam in 1996 and gave up his captain's license in 1996. After they moved to Oregon, neither party worked for several years, and Branam gave Beaver a monthly allowance. Branam paid the insurance and taxes for the home and all of the parties' bills. For the first few years, Branam did not ask Beaver to contribute financially to their joint expenses or pay rent. During the parties' cohabitation, Beaver contributed to the household by performing work on the house, including building a fence, building a deck, and gardening. After the parties separated, they had a tenant on the property, and Branam and Beaver each received one-half of the rent from the property.

The parties separated in October 2004, and Branam filed a petition for dissolution of domestic partnership and a complaint for recovery of real property and conversion of personal property. Before trial of the dissolution action, the parties sold the home, netting approximately $262,000 after sale costs, and the parties agreed that each of them would receive

an initial payment of $40,000 from the sale proceeds, with the balance held in an account pending the outcome of the trial.

After trial, the court divided the remaining assets so that Beaver and Branam equally shared the appreciated value of the home, but Branam received credit for the payments that she had made to maintain the property after the parties' separation and the purchase price that she had paid for the home. Thus, Branam received $177,801.87 plus 97.6% of the interest earned on the proceeds held pending trial, and Beaver received $4,429.60 plus 2.4% of the interest. The court concluded that "the mutual intent of the parties * * * when the real estate was acquired, was to provide shelter and support for Mr. Beaver while the couple co-habitated, but not a portion of Ms. Branam's estate." Alternatively, the court concluded that, even if the intent of the parties was unclear, it was equitable to award Branam the purchase price that she had paid for the home and to divide the appreciated value of the home equally between the parties.

■    On appeal, Beaver assigns error to the court's division of the proceeds from the sale of the home, arguing that it was the intent of the parties to share the home equally and, hence, that the court should have divided the proceeds equally notwithstanding the parties' unequal contributions to the cost to acquire the home. Beaver also assigns error to the court's refusal to admit into evidence a letter from Branam's attorney that contains statements that Beaver characterizes as evidence of Branam's intent to share the home equally. Because an action to dissolve a domestic partnership is an equitable proceeding, we review the trial court's dissolution decision *de novo*. ORS 19.415(3); *Wilbur v. DeLapp*, 119 Or App 348, 351, 850 P2d 1151 (1993).

We first consider Beaver's second assignment of error. He contends that the court erred in sustaining an evidentiary objection to the admission of a letter from Branam's attorney to Beaver. The letter was dated January 6, 2005, and sought Beaver's consent to list the home for sale with a designated realtor. In addition, the letter said:

> "What I would like to do if possible, is speak with either you or your attorney, should you choose to obtain one, to see if

we might reach an agreement along the lines discussed above. It would be our intention to have the agreement provide that after all of the expenses were paid, that the proceeds would be split fifty-fifty (50-50) between you and [Branam]."

Beaver sought to have the letter admitted at trial because, in his view, the quoted statement constitutes evidence of Branam's intention to share the house equally with him. Branam objected on the ground that the letter was inadmissible under OEC 408 as a settlement offer.[1] "OEC 408 provides that evidence of a compromise is not admissible unless it is offered for a purpose having independent relevance." *Holger v. Irish*, 316 Or 402, 414, 851 P2d 1122 (1993). Beaver counters that the letter does not expressly refer to settlement and, because there was no litigation pending between the parties when it was sent, it could not be a settlement offer. Alternatively, he argues that, even if it is a settlement offer, OEC 408 allows statements in settlement offers to be admitted when they are offered for a permissible purpose; here, he contends that the letter was offered as evidence of Branam's original intention about the property when she purchased it.

The trial court agreed with Branam that the letter was a settlement offer. The court also concluded that the letter is not evidence of Branam's intent at the time that she purchased the property, which is the relevant time frame to determine the parties' intention regarding the division of their property in this dissolution proceeding. The court concluded that, at most, the letter was evidence of her intention in January 2005 to split the proceeds of the estate evenly, which was several months after the parties had separated

---

[1] OEC 408 provides:

"(1)(a) Evidence of furnishing * * * a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either the validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

"(b) Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

"* * * * *

"(2)(b) Subsection (1) of this section also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution."

and Branam had moved out of the home. We need not resolve that dispute, however, because even if the letter were admissible, it would not alter our decision in this case on *de novo* review.

■■■ We turn to Beaver's challenge to the court's distribution of the sale proceeds of the parties' real property. In the dissolution of a domestic partnership, courts are required to divide property according to the express or implied intent of the parties at the time that they established their partnership. *Beal v. Beal*, 282 Or 115, 123, 577 P2d 507 (1978). If the court cannot discern the parties' intent, the court may exercise its equitable powers to reach a fair dissolution of the parties' partnership. *Wilbur*, 119 Or App at 351 (citing *Shuraleff v. Donnelly*, 108 Or App 707, 714, 817 P2d 764 (1991)). How the parties held legal title to real property is evidence of the parties' intent, but it is not dispositive. *Donnelly*, 108 Or App at 715; *see also Ireland v. Flanagan*, 51 Or App 837, 843, 627 P2d 496 (1981) (concluding that the parties intended joint ownership of a house even though title was taken in one party's name for the sole purpose of providing her a tax shelter).

■ Here, before purchasing the home, the parties did not discuss what would happen to it if they decided to separate. Both parties agree that Beaver wanted his name on the title to the home before moving to Oregon and leaving his position as a boat captain. Beaver testified that "I told her I didn't want to move up here unless I got * * * my name on the house to make sure that I at least had a place to live[.]" Similarly, Branam testified, "I thought we would jointly take care of the house, and then if something happened to me, he'd have at least a place to live." Beaver said he wanted his name on the property in the event that something happened to Branam or Branam died. That testimony is consistent with the deed to the property, which grants a survivorship right to the parties, and thereby would enable Beaver to remain in the home if Branam died. However, Branam and Beaver did not discuss what would happen to the property if they separated.

■ Where there is no express agreement of the parties regarding the division of their property in the event of dissolution of their domestic partnership, "courts should closely

examine the facts in evidence to determine what the parties implicitly agreed upon." *Beal*, 282 Or at 122.

> "More often than not, such an inquiry will produce convincing evidence of an intended division of property, but we recognize that occasionally the record will leave doubt as to the intent of the parties. In such cases, inferences can be drawn from factual settings in which the parties lived. Cohabitation itself can be relevant evidence of an agreement to share incomes during continued cohabitation. Additionally, joint acts of a financial nature can give rise to an inference that the parties intended to share equally. Such acts might include a joint checking account, a joint savings account, or joint purchases."

*Id.* Applying those factors, the court determined that the parties in *Beal* had intended to share the property equally and should receive equal shares of the proceeds of its sale even though Raymond Beal had made all but one of the mortgage payments on the property. However, when the Beals purchased the property, Raymond had paid $500 of the down payment and Barbara had paid $1,500 of it. Accordingly, the court concluded that Barbara should receive credit for the amount of the down payment that she had paid that had exceeded Raymond's contribution to that payment.

In *McWhirter v. McWhirter*, 54 Or App 409, 635 P2d 12 (1981), we applied the factors enumerated in *Beal* and determined that the parties intended to own real property jointly. There, the parties purchased a home for $30,000; the respondent sold his car for $2,000, which they used as a down payment, and they financed the balance of the purchase price.

> "[T]itle was taken in both parties' names, and mortgage payments were made from a joint checking account to which each contributed at first and which later consisted of proceeds generated from a joint business enterprise. Respondent wrote checks payable to petitioner on the same account to cover household expenses, with no effort made to keep a separate account for mortgage payments. The record shows petitioner contributed to the maintenance of the household, taking care of respondent's two children, along with her own daughter."

*Id.* at 412-13. Accordingly, we concluded that the parties intended to own the real property jointly and had equal interests in the property, "except that respondent is to be given credit for the $2,000 down payment." *Id.* at 413.

■      Thus, where the evidence establishes that parties in a domestic partnership intend to share property equally but one party makes a greater *initial* contribution to the property, the property will be divided equally but the party making the greater initial contribution will be credited for that contribution. Beaver contends that those cases apply only when the initial contribution is a down payment and not when, as here, the initial contribution is the entire purchase price. However, he does not cite any authority for that proposition. The trial court could not identify a principled basis to distinguish between a down payment and the payment of the entire purchase price, and neither can we.

Here, the parties took title to the home "not as tenants in common, but with right of survivorship." That language creates an "*Erickson* deed" as recognized in *Erickson v. Erickson*, 167 Or 1, 115 P2d 172 (1941), and gave the parties concurrent life estates with a contingent remainder to the survivor. *Id.* at 17-19. Branam and Beaver lived together in the home for nine years. Branam paid all of the household expenses during the parties' cohabitation, such as taxes, insurance, and utilities. Branam also gave Beaver a monthly allowance. Beaver contributed to the upkeep and improvement of the home by performing work on it, such as building a fence, building a deck, and gardening. There is no evidence that the parties maintained joint bank accounts. However, Beaver's testimony that he would not move to Oregon unless his name was on the title, and the fact that Branam put his name on the title when she purchased the home, confirms that the parties intended to share the property equally. The trial court correctly determined that the parties intended to share the property equally.

However, that does not end our inquiry, because we must determine whether Branam should receive credit for the purchase price for the home. As stated above, 225 Or App at 637-38, and following *Beal* and *McWhirter*, where the parties in a domestic partnership intend to share property

equally, the party providing a greater initial contribution to the property will receive credit for that contribution.

Beaver cites *Brazell v. Meyer*, 42 Or App 179, 600 P2d 460 (1979), for the proposition that the court may "disregard a party's greater contribution to the purchase price if it was the intent of the parties to own the property as equal co-tenants." (Emphasis omitted.) Accordingly, he urges us to award each party an undivided one-half interest in the property and not to credit Branam for the initial purchase price.

■ Although Beaver is correct that we may disregard a party's greater contribution if evidence establishes that the party intended to share that contribution, *see Ireland*, 51 Or App at 842-43, Beaver misapprehends *Brazell*. In that case, the trial court determined, and we agreed, that the parties "had no general intent, explicit or implicit, to share all the property they accumulated during the relationship." *Brazell*, 42 Or App at 182 (emphasis omitted). However, the parties used the same last name and held themselves out as being married, despite the fact that they were not married. As we stated, the woman's "use of [the man's] last name in taking title must be taken as a manifestation of an intent with respect to that property that they be treated *as if married*," and "[t]here was nothing in the record to rebut the inference that she intended at the time the property was purchased that he have an equal share." *Id.* at 184 (emphasis added).

In reaching that conclusion, we cited *Brandt v. Brandt*, 215 Or 423, 333 P2d 887 (1959), which involved another unmarried couple who held themselves out and purported to take property as husband and wife. In that case, we concluded that the couple intended to share the property equally, because of operation of the presumption of a gift that arises when a husband and wife take title jointly. *Id.* at 451. Properly understood, the evidence of intent in both *Brandt* and *Brazell* that led us to conclude that the parties intended to share property equally, *and* to disregard the parties' unequal contributions to the initial acquisition of the property, was the fact that the parties held themselves out as *married couples*. That fact was evidence that the parties, although unmarried, intended to take title *as though they were*

*married*, which, in turn, invoked the presumption of a gift that arises when a husband and wife take title jointly.

Here, Branam and Beaver did not hold themselves out as husband and wife, and accordingly, the presumption of a marital gift does not arise. Furthermore, when asked if she had intended to give Beaver the money that she had used to purchase the home, Branam answered, "No." Because there was no evidence that Branam had intended to make a gift of the purchase price to Beaver, the trial court concluded that "the mutual intent of the parties * * * when the real estate was acquired, was to provide shelter and support for Mr. Beaver while the couple co-habitated, but not a portion of Ms. Branam's estate." We agree.

Branam did not intend to share with Beaver her initial contribution to the purchase of the parties' home. Accordingly, and following *Beal* and *McWhirter*, the trial court did not err and properly gave Branam credit for her payment of the purchase price of the home.

Affirmed.