Argued and submitted November 20, 1995, affirmed February 7, petition for review denied June 18, 1996 (323 Or 483)

In the Matter of the Marriage of

Lynn Lois BAXTER,
*Respondent,*

*and*

Clifford Lynn BAXTER,
*Appellant.*

(92C-33711; CA A84804)

911 P2d 343

J. Michael Alexander argued the cause for appellant. With him on the briefs was Burt, Swanson, Lathen, Alexander, McCann & Smith, P.C.

Russell Lipetzky argued the cause for respondent. With him on the brief was Saucy & Lipetzky, P.C.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

RIGGS, P. J.

## RIGGS, P. J.

Husband appeals from a dissolution judgment, assigning error to the court's property distribution and to its award of attorney fees and costs to wife. He argues that the court improperly distributed a share of his business to wife after determining that the parties' antenuptial agreement had been rescinded by their conduct during the marriage. Wife cross-assigns error to the court's ruling regarding the antenuptial agreement, claiming that the agreement was invalid from its inception. On *de novo* review, we affirm.

At the time of the dissolution proceeding, husband, age 52, and wife, age 50, had been married 13 years. Each had four children from previous marriages and husband adopted wife's youngest daughter in 1980.

The parties met in 1977 and lived together in a condominium complex that husband owned and developed. In the spring of 1978, husband formed a limited partnership to purchase a golf course that was adjacent to the condominium complex. In November 1978, the parties became engaged. Around that same time, the two individuals with whom husband had formed the partnership died in a plane crash, forcing husband to buy out the deceased partners' shares and to finance the golf course on his own.

The parties discussed the possibility of entering into an antenuptial agreement several months before their wedding and an agreement was eventually executed. The parties were aware of the full extent of each other's premarital assets, including the existence of the golf course, before signing the agreement. After their marriage in December 1979, wife continued to work for the State of Oregon and husband focused his efforts on operating and financing the golf course. In October 1982, wife left her employment and started working full-time at the golf course as a sales person in the pro shop and as a coordinator of special events. She did not receive a salary for her work. In 1984, the parties' financial situation took a turn for the worse when several payments to the estates of husband's deceased partners and a balloon payment on the golf course came due. To meet those obligations, husband and wife both signed promissory notes

amounting to $125,000. Wife also cashed in her PERS retirement account with the state to pay off a $7,000 debt owed by the pro shop.[1]

Thereafter, the golf course became more profitable. Husband pursued his goal of becoming a golf professional. Wife continued to work full-time at the golf course without pay, and the parties operated the business together until they separated in November 1988. In May 1989, wife obtained paid employment elsewhere. The parties reconciled in November 1989 but separated again in 1992. Wife filed a petition for dissolution soon thereafter.

The primary issue at trial was whether the terms of the antenuptial agreement that husband and wife had executed should be enforced, particularly with respect to the distribution of the golf course. The trial court ruled that the antenuptial agreement was valid and that the parties initially conducted their financial relationship in a manner consistent with the agreement, but that their combined personal and financial efforts to preserve the golf course had effectively rescinded the agreement. The court ordered that the golf course be sold, awarding husband two-thirds and wife one-third of the proceeds remaining after the debts connected to the property were paid. The court did not award spousal support but ordered both parties to contribute child support for their daughter, who attends college. The court awarded wife costs and attorney fees, including her expert witness fees.

Husband assigns error to the court's property distribution, challenging its determination that the parties rescinded their antenuptial agreement. Wife cross-assigns error to the court's ruling, arguing that the agreement was invalid from its inception. Because a valid contract must exist before it can be rescinded, we address wife's cross-assignment first.[2]

---

[1] The parties dispute whether wife was later reimbursed for that expenditure.

[2] We note at the outset that the Uniform Premarital Agreement Act, ORS 108.700 *et seq*, does not apply because the agreement was executed in 1979. *Purcell and Purcell*, 99 Or App 668, 783 P2d 1038 (1989).

■ The validity of an antenuptial agreement is judged in the context of the circumstances under which it was executed. *Merrill v. Merrill*, 275 Or 653, 656, 552 P2d 249 (1976). We primarily consider whether the parties were aware of the purpose of the agreement and the nature and extent of the property affected by it, and whether the document was presented to the receiving party at a reasonable time before the wedding to allow that individual the opportunity to seek counsel and to review its terms. *Merrill*; *Knoll and Knoll*, 65 Or App 484, 671 P2d 718 (1983).

At trial, husband and wife presented conflicting testimony about the circumstances surrounding the preparation and execution of the antenuptial agreement.[3] Wife testified that husband presented the agreement to her on the night before the wedding and that she glanced at the document only briefly before throwing it behind the parties' waterbed. She further testified that husband approached her on the morning of the wedding, after she had spent several hours preparing and decorating the parties' wedding cake, and told her that she had to sign the agreement, which she did. She claims that she never read the agreement and was never advised to seek counsel. Husband testified that he explained the purpose of the agreement to wife and that he gave her several copies to sign three to four weeks before their wedding day. He also testified that he told her to review the document with an attorney and that, despite his frequent reminders, wife procrastinated until she finally signed several copies of the document two days before the wedding. He acknowledged that they did not discuss the actual terms of the agreement at the time wife signed it. Husband's recollection is that the parties agreed that they would retain their respective properties in the event of a divorce.

■ The trial court, without expressing any opinion as to the credibility of either party, upheld the validity of the

---

[3] That conflict is exacerbated by the fact that, in 1982, wife destroyed several copies of the antenuptial agreement and no copy of the agreement could be found in husband's attorney's files. Neither of the attorneys involved in the preparation of the antenuptial agreement testified at trial. As a result, there is no conclusive evidence of the terms of the agreement or the date on which the parties signed it.

antenuptial agreement. It did not make any findings as to the terms of the agreement or the circumstances surrounding its execution, but we assume from its determination that it found husband's testimony more credible. In instances such as this, where an appellate court exercises *de novo* review in a situation where there is conflicting testimonial evidence, the common approach is to defer to the trial court's findings unless there is evidence in the record to suggest that those findings are incorrect. As the Supreme Court stated in *Merrill*:

> "We do not know specifically what the trial court found, but we are not going to reverse a decree by deciding one witness is to be believed and another witness is not to be believed unless because of peculiar circumstances we are convinced that the trial court's decision in this regard is clearly erroneous." 275 Or at 657 (citation omitted).

In this case, each party's factual account would support a different conclusion regarding the validity of the antenuptial agreement, and we do not have the benefit of any further testimony or evidence that corroborates or contradicts either party's rendition of the facts. Because the trial court had the opportunity to see and hear the witnesses, we defer to its presumed findings; nothing in our review of the evidence indicates that the trial court's decision to uphold the agreement was incorrect. *Id.* at 657-58 (deferring to trial court's resolution of conflicting evidence regarding execution of antenuptial agreement); *Simmons and Simmons*, 82 Or App 540, 728 P2d 921 (1986) (same); *Norris and Norris*, 51 Or App 43, 624 P2d 636, *rev den* 291 Or 151 (1981) (same).

■■  The remaining issue is whether husband and wife rescinded their antenuptial agreement during the course of their marriage. Rescission of a contract must occur "by agreement of the parties, whether expressed by words or manifested by conduct." *Edgley v. Jackson*, 276 Or 213, 218, 554 P2d 476 (1976). Because the parties did not expressly agree to rescind their antenuptial agreement, we must decide whether their conduct demonstrated mutual intent to no longer be bound by its terms.

There is no dispute that during the early years of their marriage, the parties conducted their affairs consistent with the existence of their antenuptial agreement. They

maintained separate full-time employment, kept separate bank accounts and did not hold any of the business assets jointly. *See Bowers and Bowers,* 136 Or App 112, 900 P2d 1085 (1995) (no intent to rescind found where wife maintained separate employment and had limited involvement with husband's corporation). While wife worked for the State of Oregon, she provided a steady source of income that was used to pay monthly family expenses, whereas the income earned from the sale of condominiums in husband's complex was used to keep the golf course financially solvent. When wife left her outside employment after filing a stress claim, she immediately began working full-time at the golf course with husband, contributing considerable time and effort in what she described as an attempt to preserve the parties' future. As the parties' financial prospects dimmed, wife took the significant step of cashing in her retirement account, one of her remaining sources of financial independence from husband, to pay a pro shop debt, and cosigned promissory notes necessary to complete the purchase of the golf course. Husband did not discourage wife's efforts, even when she went back to school to take marketing classes so that she could more effectively promote special events at the golf course. For almost half of their marriage, the parties worked together to turn the golf course into a profitable venture. We believe, as did the trial court, that the parties' conduct demonstrated mutual intent to rescind the antenuptial agreement and, on *de novo* review, conclude that the trial court's property distribution was just and proper under the circumstances. ORS 107.105(1)(f).

■      Husband's two remaining assignments of error challenge the trial court's award of attorney fees and costs, including expert witness fees, to wife.[4] We have reviewed husband's arguments and conclude that the award was proper.

Affirmed. Costs to wife.

---

[4] Husband withdrew his second assignment of error, which asserted that the trial court erred in ordering the sale of the golf course.