Argued and submitted December 8, 2009, affirmed November 3, 2010

In the Matter of the Domestic Partnership of

Richard J. GREULICH,
*Petitioner-Appellant,*
*and*

Julie Ann CREARY,
Personal Representative of
the Estate of Margaret Creary,
*Respondent-Respondent,*

*and*

Julie Ann CREARY,
Trustee of the Margaret Creary Irrevocable Trust,
and Julie Ann Creary,
*Third-Party Respondents-Respondents.*

Multnomah County Circuit Court
041273033; A135685

243 P3d 110

Gilbert B. Feibleman argued the cause for appellant. With him on the brief was Feibleman & Case, P.C.

Kimberly A. Quach argued the cause for respondent Julie Ann Creary, Personal Representative of the Estate of Margaret Creary. With her on the brief were Mark Johnson and Johnson & Lechman-Su PC.

Michael Yates argued the cause for respondent Julie Ann Creary, individually, and as Trustee of the Margaret Creary Irrevocable Trust. With him on the brief were Sarah J. Brown and Yates Matthews & Eaton, PC.

Before Landau, Presiding Judge, and Schuman, Judge, and Sercombe, Judge.

LANDAU, P. J.

## LANDAU, P. J.

At issue in this case is whether the parties, who lived together for over 18 years, intended to pool their resources for a common benefit so as to create a domestic partnership. Petitioner Greulich argues that the long duration of the parties' relationship, the fact that they occasionally held themselves out as married, and the fact that they shared at least one credit card demonstrate the intention to form a domestic partnership. Respondent Creary[1] argues that she had been insistent and unequivocal throughout their relationship— during which the impecunious Greulich was involved in litigation and twice filed for bankruptcy protection—that her property was hers alone. The trial court agreed with Creary, and Greulich appeals. On *de novo* review, *Pinto and Smalz*, 153 Or App 1, 3, 955 P2d 770 (1998),[2] we agree that the parties' relationship did not constitute a domestic partnership and, therefore, affirm.

The parties met and began dating in February 1983. At the time, Greulich was 30, and Creary was 52. Creary was recently divorced after a 33-year marriage and was financially well-off: She owned a successful interior design business and a number of pieces of real property, including nine Portland-area rental properties and Englewood, an eight-acre estate that included a main residence, a cottage, filbert orchards, and five horse paddocks.

By comparison, Greulich's financial situation was bleak. Although, in earlier years, he had enjoyed some economic success as a stockbroker and financial planner, by the time that he met Creary, he was deeply in debt; he told Creary within a few weeks of their meeting that he owed in excess of $130,000 in consumer debt, with about $12,000 in

---

[1] Respondent Margaret Creary died during the pendency of this appeal. Because we allowed a motion to substitute the real party in interest, the actual respondent in this case is the personal representative of her estate. Nevertheless, we refer to Creary as the respondent in this case for the sake of clarity.

[2] In 2009, the legislature amended ORS 19.415(3)(b), making discretionary this court's *de novo* review of cases in an equitable proceeding other than those that involve the termination of parental rights. Or Laws 2009, ch 231, § 2. Because this appeal was filed before the effective date of that statutory change, the current version of the statute does not govern our standard of review in this case.

monthly obligations. Creary loaned Greulich approximately $15,000 to help pay some of those debts.

Greulich and Creary made plans to get married in Hawaii in May 1984, and Creary purchased wedding rings. While in Hawaii for the planned nuptials, however, Creary decided not to marry Greulich in order to protect her assets from his financial liabilities. In the meantime, Greulich had been sued for $3 million for allegedly selling unregistered securities, his personal residence had been lost to foreclosure, and he had filed for bankruptcy protection, claiming over $4 million in debt and $16,000 in total assets.

After they returned from Hawaii, Greulich moved into Creary's Englewood estate. They shared a bed, as they would for the next 13 years. Greulich paid no rent to live at Englewood, and Creary paid for most of his living expenses. Creary took out a loan in her own name to purchase a car for Greulich and maintained the insurance on the vehicle in her name, as well, although Greulich did make some of the loan and insurance premium payments himself.

Despite the fact that the parties did not get married, Greulich regularly wore his ring from the time he and Creary returned from Hawaii until 1998, when he developed a rash that prevented him from wearing it; Creary only wore her ring on a few occasions when petitioner requested she do so to impress his friends or business associates. The parties' families knew that they were not married, although a few of Greulich's acquaintances believed that they were.

One year after their aborted marriage plans, in April 1985, Greulich and Creary again decided to get married, this time in Paris. They never took that trip, however, and they did not get married.

Another year later, in April 1986, the parties planned another trip to Hawaii to get married. This time, Creary asked Greulich to sign a prenuptial agreement, which provided that, in the event of a divorce, Greulich was barred from making any claim against the property that Creary brought into the relationship. Greulich signed it, although he later asserted that he did not comprehend the effect of the

document at the time he signed it. While in Hawaii, the parties had an argument, and Greulich called off the wedding.

The parties never again made marriage plans, although they continued to live together for the next 16 years. Meanwhile, the upkeep of Englewood was done by staff that Creary hired, including gardeners, handymen, nurses, plumbers, machinery repair specialists, roofers, and housekeepers. Greulich later claimed to have contributed to the upkeep of the property, but the extent of that contribution is in dispute. It appears that Greulich may have occasionally mowed the surrounding fields, maintained the swimming pool, maintained the tractor, and trimmed the trees. He also ran some errands for Creary's interior design business, accompanied her on some of her business trips, and did odd jobs at the rental properties, although, again, the evidence is clear that nearly all of the repairs and maintenance of those properties was performed by hired workers.

In 1991, Creary obtained a credit card for Greulich to use to purchase groceries and other household items. Greulich was the only person who used the card, but Creary made all of the payments. The parties never discussed their previously executed prenuptial agreement, although Creary told Greulich on numerous occasions that she wanted her three children to inherit her property. At one point, nonetheless, Greulich listed Englewood as a personal asset on an application for a small business loan.

Greulich's mother died in 1992 and left him a $35,000 inheritance. He claims that he spent a good portion of the money (the net after taking a trip to London to drive race cars) to purchase items for Englewood. But the evidence is not clear what Greulich spent the money on.

In 1997, Creary fell and broke her neck. During her recovery, she moved out of the bedroom that she had shared with Greulich since 1984 and into another bedroom at Englewood. Greulich provided some care for Creary, although her family and employees provided most of the assistance. After Creary's fall, her daughter assumed all of the responsibilities for the rental properties.

Greulich had very little income during the time that he lived at Englewood other than the inheritance. He claimed that he filed no tax returns during that 17-year period because he had earned no taxable income. He attempted to work as a financial planner and stockbroker, but without success. He started two companies of his own, but they were dissolved in 2002. In 2003, he filed for bankruptcy protection a second time.

By August 2002, Creary was still not in good health and believed that she could no longer afford to support Greulich. She asked him to move out of Englewood. During the time that Greulich lived at Englewood, its property value increased by nearly $3 million.

Greulich ultimately responded with a demand letter claiming that the parties' 18-year cohabitation constituted a domestic partnership, entitling him to half of the partnership estate—in particular, half of the appreciation of Englewood. Creary refused Greulich's demand. Shortly after that, Creary transferred ownership of one of her rental properties to her daughter. A few months later, Creary established an irrevocable trust for which she named her three children as beneficiaries and her daughter as trustee; Creary transferred the ownership of Englewood to that trust.

Greulich then initiated this action against Creary, alleging the existence of a domestic partnership and seeking a money judgment for his share of its assets in the amount of $1.3 million. He further requested that the trial court set aside what he characterized as Creary's fraudulent conveyances of Englewood and other properties. He alleged that she transferred the properties to the trust to shield them from his domestic partnership claim. As a result, he named Creary's daughter and the irrevocable trust—the new owners of those pieces of property—as third-party respondents in this case. Creary responded that, although Greulich was her roommate and companion, she made clear to him that she never intended their cohabitation to give him any rights to any of her property.

After an eight-day trial, the trial court agreed with Creary that Greulich had failed to prove the existence of a domestic partnership. The court found that the parties did

not evidence an intention to pool their resources. To the contrary, the court found that Creary had told Greulich that she wanted her property to go to her children; that, early in the relationship, Greulich had signed a prenuptial agreement spelling out that he would not be entitled to her property; that Greulich's contention that he did not understand the agreement was not credible; and that the parties never had any other verbal or written agreement about dividing Creary's property. Given its finding that no domestic partnership existed, the court saw no need to address Greulich's contentions about Creary's property conveyances.

On appeal, Greulich advances two assignments of error. In his first assignment, he contends that the trial court erred in failing to find that he had established the existence of a domestic partnership and in failing to award him half of the appreciation in value of Englewood during the parties' cohabitation. Greulich acknowledges that they "may not have shared many joint financial accounts." But he insists that their lengthy period of cohabitation "is a better indication of an intent to share resources." He argues that, in any event, the parties shared an "important" financial account for 11 years, that is, the single credit card that he used to pay for household expenses. He claims that, because "he thought he was jointly liable for the credit card," that should be considered a joint account. Greulich also points to the fact that he listed Englewood as one of his assets on his small business loan application, thus treating Englewood as their joint property, despite the fact that it was titled in Creary's name only. He contends that their lengthy cohabitation and the fact that the parties held themselves out as married, at least in some settings, are indications that they had formed a domestic partnership. Furthermore, he insists that his economic and noneconomic contributions to the relationship (for example, using some of his inheritance to purchase items for Englewood, as well as assisting Creary in her business, maintaining the Englewood property, doing odd jobs at the rental properties, and providing care for Creary after her accident) "deserve recognition and compensation." As for the prenuptial agreement stipulating that he and Creary would retain their separate property in the event of a divorce, Greulich contends that that is of no consequence because the parties

ended up not marrying, and they never took steps to "implement the intent of the document."

In his second assignment of error, Greulich contends that the court erred in failing to address Creary's allegedly fraudulent property conveyances. He concedes that, if we reject his argument on the first assignment, we need not address the fraudulent conveyance issue.

In response, Creary maintains that her relationship with Greulich was not a domestic partnership and that she never intended to confer on Greulich any rights to her property. Creary notes, in particular, her repeated declarations to Greulich that she intended her property to go to her children, the existence of the signed prenuptial agreement clearly indicating that Greulich had no claim to her property, and the fact that Greulich's representations about his contributions to her business, property, and personal welfare are not worthy of belief.

Creary also asserts that, if this court were to address Greulich's second assignment of error, the appropriate disposition would be a remand for the trial court to consider it in the first instance. Creary's daughter, individually and as the trustee of Creary's irrevocable trust, asserts that the property conveyances were not fraudulent, but, in any event, agrees with Creary that this court must remand the case to the trial court.

■■ We begin—and end—with our analysis of the issue raised by the first assignment of error, that is, whether the parties' relationship constituted a domestic partnership such that Greulich is entitled to an equitable portion of the partnership property. In relationships involving cohabitation, there is no presumption of equal contribution to the acquisition of property owned by the parties during the relationship. Rather, in determining how property should be distributed following the breakdown of a relationship that is arguably a domestic partnership, the primary consideration is whether the parties—either expressly or impliedly—"intended to pool their resources for their common benefit." *Beal v. Beal*, 282 Or 115, 122, 577 P2d 507 (1978).

■ In the absence of an express agreement, a court must examine the evidence to determine whether the parties intended to pool their resources for their common benefit. Factors to consider in determining whether there was such an implied agreement "include how the parties held themselves out to their community, the nature of the cohabitation, joint acts of a financial nature, if any, how title to the property was held, and the respective financial and nonfinancial contributions of each party." *Wallender v. Wallender*, 126 Or App 614, 617, 870 P2d 232, *rev den*, 319 Or 150 (1994).

Greulich, in arguing for the existence of a domestic partnership, places heavy reliance on the length of his relationship with Creary. Citing *Shuraleff v. Donnelly*, 108 Or App 707, 714, 817 P2d 764 (1991), he contends that a relationship of extremely long duration may provide better evidence of the parties' intentions than other indicia such as maintaining their property jointly. Greulich points out that, in *Shuraleff*, this court found a domestic partnership when the parties cohabited 15 years, in spite of the fact that they kept their finances separate. Greulich, however, reads more into *Shuraleff* than careful examination will bear.

In *Shuraleff*, the couple lived together for 15 years. Although they held several pieces of real property jointly and "dream[ed]" together about their mutual retirement, they each paid a share of the monthly living expenses, did not file joint tax returns, and did not have joint bank or charge accounts. *Id.* at 709, 710, 712-13. This "unique" and "symbiotic" relationship included purchasing property in the sole name of one party, but using the property of the other as security and then jointly developing the property as a holly farm, with both contributing to its operation. *Id.* at 709, 715. Under the circumstances, we concluded, equity compelled the recognition of a domestic partnership. *Id.*

In this case, although the duration of the parties' relationship is similar to the one at issue in *Shuraleff*, that decision is, in other material respects, quite distinguishable. In particular, there is no evidence that the parties in this case used their respective assets in ways that maximized their mutual economic benefit. That factor, not the duration of the relationship, was the driving consideration in *Shuraleff*.

Closer in point is our more recent decision in *Baker and Andrews*, 232 Or App 646, 223 P3d 417 (2009). In that case, the parties cohabited a total of 24 years—even longer than the parties in this case. *Id.* at 648. Following a review of the relevant cases, we concluded that the proper focus is not the duration of the relationship but the parties' intent to share resources:

> "In general, an equitable property division on dissolution of domestic partnership is appropriate where the parties' intent to share assets and expenses is shown by evidence that they have jointly purchased, built, or maintained property, held joint accounts, and made substantial economic and noneconomic contributions to the household for mutual benefit."

*Id.* at 652. Turning to the facts of that case, we found insufficient evidence of intent to pool resources, given the absence of financial interdependence. *Id.* In particular, we noted that the parties did not have joint accounts or investments; nor was there evidence of significant contributions to the household. *Id.* That is the state of the evidence in this case, as well.

Greulich also relies on what he regards as the compelling evidence of his contributions to the upkeep of Englewood. Suffice it to say that, on that point, the evidence is less than compelling. As the trial court found, the precise nature of Greulich's contributions is not so clear. What is clear is the fact that the vast majority of the effort to maintain Englewood was performed by a cadre of hired gardeners, handymen, nurses, housekeepers, plumbers, machinery repair specialists, and roofers, among others. Moreover, there is a complete absence of evidence that, whatever Greulich's efforts may have been, they were sufficient to have conferred any substantial benefit to the value of the property.

Greulich also emphasizes the fact that, at least occasionally, the parties held themselves out to be husband and wife. The parties, however, did not enter into a single financial transaction representing themselves to be husband and wife. Indeed, there is no evidence that the parties ever signed a single document representing themselves as husband and wife. At best, there is evidence that Greulich wore his ring for a number of years and that he persuaded Creary to do so on a

few occasions in order for Greulich to impress his friends or business associates. That strikes us as meager evidence of the intention to pool resources that the law requires.

What evidence there is about the intention to pool resources seems clearly to suggest the absence of such an intention. Greulich offered no evidence of any agreement, written or oral, that the parties were to divide all property at the end of their relationship. To the contrary, Creary repeatedly told Greulich that she wanted her children to inherit her property. Consistently with that expressed desire, she asked Greulich to sign a prenuptial agreement barring him from making any claim against the assets that she brought into the relationship. And Greulich signed the agreement. His later protestations that he did not fully appreciate the significance of the agreement are, as the trial court found, not credible. Similarly, Greulich's argument that the prenuptial agreement is irrelevant because the parties never married is not persuasive. The point is not whether the agreement was enforceable; it is, rather, the fact that it provides direct, written documentation of the parties' intentions concèrning their relationship.

■     Greulich rejoins that, even assuming that the prenuptial agreement supplies evidence of the parties' intention at the time of its signing, the subsequent conduct of the parties effectively nullified that intent. It is true that the parties to a prenuptial agreement may, by their conduct, rescind it. *See, e.g., Baxter and Baxter,* 139 Or App 32, 38, 911 P2d 343, *rev den,* 323 Or 483 (1996) ("[T]he parties' conduct demonstrated mutual intent to rescind the antenuptial agreement * * *."). We find no such evidence in this case, however. According to Greulich, the fact that Creary accepted his many acts of assistance with the properties provides the evidence. As we have noted, however, the evidence of Greulich's efforts is somewhat less significant than he suggests. Certainly, it falls short of demonstrating a *mutual* intention to abandon the understanding reflected in the prenuptial agreement.

Of particular significance to our consideration of the parties' intention to pool resources is the fact that there were

no joint accounts, no joint investments, no jointly held properties, and no jointly held retirement plans. *See Baker*, 232 Or App at 652 (finding absence of "evidence of interdependence and joint financial operations" dispositive). Greulich insists that some intention to pool resources may be inferred from the fact that Creary gave him a single credit card. According to Greulich, he *believed* that he was jointly responsible for the account, although that may not have actually been the case and although he never actually made a payment on the account. Greulich does not explain, and we do not understand, how his unilateral misapprehension of the nature of the account provides evidence of the parties' mutual intentions concerning the disposition of their property.

In short, the evidence in this case does not establish that the parties intended to pool resources for their common benefit. We conclude that the trial court did not err in rejecting Greulich's claim of a domestic partnership and refusing to award him an interest in Creary's property. Our decision in that regard renders Greulich's assignment of error pertaining to the alleged fraudulent conveyances a moot point.

Affirmed.