255 P.3d 634 (2011)
242 Or. App. 452
In the Matter of the MARRIAGE OF Perry S. PATTERSON, Petitioner-Respondent, and
Stephen C. KANAGA, Respondent-Appellant.
150221638; A137597.
Court of Appeals of Oregon.
Argued and Submitted March 5, 2010.
Decided April 27, 2011.
*635 George W. Kelly, Eugene, argued the cause and filed the briefs for appellant.
Jeffrey E. Potter, Eugene, argued the cause for respondent. With him on the briefs was Gardner, Honsowetz, Potter, Budge & Ford.
Before HASELTON, Presiding Judge, and ARMSTRONG, Judge, and DUNCAN, Judge.
DUNCAN, J.
In this dissolution case, husband appeals the trial court's division of the parties' marital property.[1] Husband argues that the trial court erred by concluding that the parties' separation agreement controlled the division of their property at dissolution. Specifically, he argues: (1) the parties did not intend the separation agreement to control the division of their property at dissolution; (2) even if the parties intended the agreement to control the division of their property at dissolution, they rescinded the agreement by their conduct during their separation; and (3) even if the parties intended the agreement to control the division of their property at dissolution and did not rescind the agreement, the agreement is unenforceable because it violates the law and contravenes public policy. For the reasons explained below, we reject husband's arguments and therefore affirm.
We review the trial court's decision de novo; we "try the cause anew upon the record." ORS 19.415(3) (2007).[2] That is, we "independently assess and evaluate the evidence," State ex rel. Dept. of Human Services v. Shugars, 208 Or.App. 694, 712, 145 P.3d 354 (2006) (internal quotation marks omitted), although we defer to the trial court's credibility findings, Cook and Cook, 240 Or.App. 1, 9, 248 P.3d 420 (2010).
We begin with the relevant facts.[3] The parties were married in 1981, when husband was in law school in Connecticut. After husband graduated, the parties moved to California, where husband worked for a large law firm. Husband was successful in his career; he earned between $100,000 and $200,000 a year and, after eight years, became a partner at the firm.
Wife's family is wealthy, and she is the beneficiary of several trusts. While husband worked at the firm, wife worked as a homemaker and cared for the parties' two children, who were born in 1982 and 1988. The parties lived off husband's income almost exclusively. Wife used the income from her trusts to pay for occasional gifts and personal *636 purchases. She withdrew less than $7,000 in most years, and never more than $15,000.
Husband worked long hours at his firm, and the hours eventually took a toll on the parties' marriage. Around 1991, the parties began discussing the possibility of a career change for husband, which would allow him to spend more time with the family and work in public interest law. In 1993, the parties moved to Oregon, where husband took the state bar examination and began working for a legal aid office. The parties agreed that they would each contribute $3,000 a month to the family's expenses; husband's contribution would come from his legal aid salary and wife's would come from her trusts.
After the parties moved to Oregon, wife told husband that she wanted to separate and buy a house in her own name. She filed a separation action in July 1994. She subsequently bought a house, the Schnorenberg house, with money from one of her trusts and titled it in the name of the trust. The entire family moved into the house.
During the pendency of wife's separation action, husband represented himself, and wife was represented by an attorney, Platt. As detailed below, after months of negotiations, the parties executed a separation agreement in January 1995. The trial court incorporated the agreement into a separation judgment, which was entered in May 1995. The agreement included terms of settlement relating to spousal support and distribution of the parties' property. The agreement awarded wife all of her trusts, which were worth approximately $700,000. All property acquired after the effective date of the agreement was to be the sole and separate property of the party acquiring it, and each party waived "all rights in and to such future acquisitions of the other."
Despite the separation judgment, the parties continued to live together with their children in the Schnorenberg house. Husband leased a cabin, which was intended to be his own residence, but it was 45 minutes away and the children did not like to go there except on weekends. As a result, husband and wife lived together at the Schnorenberg house in order to, as wife testified, "best parent our children." The parties slept in separate rooms. After the lease on the cabin expired, husband paid wife $500 a month in rent to live in the Schnorenberg house.
In 1998, wife paid the first month's rent for an apartment, with the intent that husband move from the Schnorenberg house to the apartment. But the entire family moved into the apartment. As wife explained, "We wanted to parent our children together, and a lot of times that's easier under the same roof." After the first month, each party paid $500 a month in rent for the apartment. Wife viewed the apartment as "our transition house until the children were raised[.]" Initially, the parties slept in separate beds in the same room, but after a short period of time, wife slept in a separate room. Wife stopped staying overnight at the apartment when the parties' oldest child left for college in 2001. Thus, the parties lived together for approximately seven yearsfrom 1995 to 2001after they legally separated.
When the parties lived together, they participated in family activities with their children. They ate family dinners and went to the movies, theater, and symphony together. They also took family trips, but generally stayed in separate rooms and paid their own expenses.
As mentioned, the separation agreement divided the parties' property. Wife testified that, in 1995, she told husband that "everything is separate." Husband testified that, after 1995, the parties used their own separate accounts to pay "for almost everything." The separation agreement awarded husband all of the parties' joint bank accounts, and although husband did not take wife's name off the accountswife ceased using the accounts after the parties separated. She did not contribute to or make withdrawals from them. All of wife's trust distributions were deposited into her own separate accounts.
For approximately four years after entry of the separation judgment, the parties maintained two joint credit card accounts. During that time, wife did not use one of the accounts at all, and she paid all of her charges on the other (for which the parties *637 received a single bill that identified charges by cardholder number).
Each of the parties contributed to daily household expenses, such as groceries. Each also contributed to their children's expenses, most notably medical expenses for their oldest son, who was diagnosed with a serious illness in 1997. Under the parties' coparenting plan, wife was responsible for paying 60 percent of the children's uninsured medical expenses and husband was responsible for paying 40 percent. In 1997, husband withdrew funds from his retirement account, which was worth more than $150,000 at the time, to help pay for the oldest son's unreimbursed medical expenses. Husband incurred penalties and taxes for withdrawing funds from the account. Ultimately, husband exhausted the account to pay for the medical expenses and what he characterizes as "other family-connected needs."
In October 2002, wife filed a petition for dissolution. In the subsequent dissolution trial in July 2003, the parties disputed whether their separation agreement controlled the division of their property at dissolution. Wife argued that the division of property under the separation agreement was intended to be permanent and could not be revised at dissolution. Husband, on the other hand, argued that the division under the agreement was intended to be temporarythat is, it was intended to apply only during the separationand could be revised at dissolution. The trial court held that the separation agreement was unambiguous; by its terms, it was intended to be a "full, binding and complete final property settlement." Therefore, the court concluded, the agreement controlled the division of the parties' property at dissolution.
Husband appealed. We held that the separation agreement was ambiguous and remanded the case to the trial court to receive extrinsic evidence regarding whether the parties intended the agreement to apply at dissolution. Patterson and Kanaga, 206 Or. App. 341, 350, 136 P.3d 1177 (2006) (Patterson I). We explained:
"Wife relies on the presence of several provisions that express an intention `to settle the issues between them,' and to `finally settle all the issues covered herein.' In particular, she notes that the agreement covers spousal support, waiver of inheritance rights, tax allocation, maintenance of life insurance for the children, distribution of property, and the likeall issues normally negotiated in a dissolution agreement.
"Husband argues that each of those provisions does not necessarily imply an intention to govern dissolution, and each just as plausibly could pertain to the period of separation that the parties had contemplated at the time. Husband notes, in particular, the fact that the agreement itself is denominated a `Separation Agreement' and that the word `dissolution' appears only once in the entire eight-page document.
"We conclude that the construction proposed by each party is at least reasonable. Wife is correct that some of the provisions suggest that the parties intended the agreement to resolve their disputes with finality and that that at least implies that they contemplated that it was to apply to eventual dissolution. But wife's is not the only reasonable construction. Husband also is correct that construing the agreement to apply only to separation conflicts with nothing in the agreement and that, to the contrary, it is expressly labeled a `Separation Agreement.'"
Id. at 349-50, 136 P.3d 1177.
Because we remanded the case, we addressed husband's argument that, if the trial court found that the parties intended the property division under the agreement to be permanent, the court nevertheless was required, under ORS 107.105(1)(f), which governs the division of marital assets at dissolution, to determine whether the property division under the agreement was "just and proper division in all the circumstances." Husband argued that a trial court always retains the authority to evaluate whether a settlement agreement, and any property division under it, is "just and proper." Wife, on the other hand, argued that, if the trial court found that the parties intended the property division under the agreement to be permanent, then the court was required to enforce the agreement under ORS *638 107.104(1)(b), which provides that it is the policy of this state "[f]or courts to enforce the terms of settlements" that, like the parties' separation agreement, have been incorporated into judgments, "to the fullest extent possible, except when to do so would violate the law or would clearly contravene public policy." We agreed with wife, concluding:
"[I]f the trial court determines on remand that the parties intended their agreement to apply in the context of a dissolution, it will need to address whether enforcement of its terms would violate the law or clearly contravene public policy. If it finds that the enforcement of the agreement would not do either, then the court will be required, under ORS 107.104, to enforce the agreement according to its terms."
Patterson I, 206 Or.App. at 351-52, 136 P.3d 1177.
On remand, the parties presented extrinsic evidence regarding their intent at the time of the execution of the 1995 separation agreement. Husband and wife testified, as did wife's attorney, Pratt, and two of the parties' counselors, Rexius and Siemens. In addition, the parties submitted copies of letters Pratt and husband exchanged regarding the agreement. The letters show that the parties were trying to resolve their property issues and that they were aware dissolution was a possibility in the future, although both stated that they were not pursuing dissolution at the time. Indeed, in her letters, Pratt repeatedly informed husband that wife had no present intention to end the marriage.
Nevertheless, Pratt also repeatedly informed husband that the parties' property issues needed to be resolved. In her October 19, 1994, letter, Pratt told husband, "[Wife] is not now dropping the separation lawsuit. The property issues need to be resolved at this time. I've explained to [wife] that issues surrounding the children, including child support, are always subject to modification under Oregon law if and when circumstances change in the future." (Underscoring in original.)
Wife pursued a separation action because she wanted the parties' separation agreement incorporated into, and enforceable as a part of, a separation judgment. Husband wanted wife to dismiss her separation action; he was concerned about the effect of a legal separation on the parties' prospects for reconciliation, as well as on their children. Husband tried to persuade wife to proceed more slowly by first executing a postnuptial separation agreement without court involvement. In a November 21, 1994, letter to Pratt, husband suggested a three-step process: "A formal agreement now, a lawsuit and court-ordered separation possibly later, and the quick conversion of that into a divorce order possibly after that, is the 3-step gradual process I suggest." In two other places in the letter, husband reiterated that a separation judgment could be quickly converted into a dissolution judgment.
Husband asserted that, as the first step, a detailed formal agreement would be "sufficient under the circumstances," but he further offered, as an alternative first step, to "sign a stipulated order with a [blank] case number and other papers to be filed if the second step of a court order is desired in the future." He continued, "As to terms, I don't think any significant property issues could be resolved differently than you propose."
In her December 6, 1994, response, Platt wrote that wife was not willing to enter into a postnuptial agreement because "there is no way to reach a legally enforceable agreement on the property issues in the context of this domestic relations subject matter, except by incorporating it into a Judgment of Unlimited Separation." She explained that wife needed the property division and a coparenting plan incorporated into a judgment to "have some sense of order and finality on those issues in her life, so that she can simply get on about living."
In his next letter to Platt, dated December 14, 1994, husband again suggested that the parties enter a postnuptial separation agreement. He asserted that, although courts can reject marital settlement agreements as unfair, "it is rare for a court not to approve them" and that the parties could include "enough findings [regarding fairness] to make [an agreement] enforceable." In the end, however, husband was unable to persuade *639 wife to enter into a postnuptial separation agreement and dismiss her separation action. Thus, the parties skipped the first step in husband's proposed three-step process and proceeded to the second: they entered into the separation agreement at issue here, which was incorporated by reference into the separation judgment and which, as both parties were aware, could be quickly converted into a dissolution judgment.
At the trial on remand, Platt testified that the separation agreement was intended to be "[t]he final agreement." She included the word "final" in paragraph 20which provides, in part, that the agreement "is intended to be a full, binding and complete final property settlement between the parties except as specifically set forth herein, subject only to approval of the court"to mean that the parties would not revisit the property, debt, or spousal support provisions at a later date.
As noted, husband and wife both testified at the trial on remand. Wife testified that she intended the property division under the settlement agreement to be permanent, but that she did not communicate that directly to husband. She presented evidence, through her counselor, Rexius, that she "detests conflict." Husband testified that he did not intend the property division to be permanent; he thought it would apply only during the parties' separation and, if he had thought it was permanent, he would not have proceeded without further disclosure about wife's resources.
Husband made three arguments to the trial court: (1) the parties did not intend the separation agreement to control the division of their property at dissolution; (2) even if the parties intended the agreement to control the division of their property at dissolution, they rescinded the agreement through their conduct during their separation; and (3) even if the parties intended the agreement to control the division of their property at dissolution and did not rescind the agreement, the agreement is invalid because it violates the law and contravenes public policy.
The trial court found that the parties are "good people who love their children and are devoted parents" and that they have done "extraordinary things" for the benefit of their community, husband through his legal aid work and wife through her charitable donations. Regarding the credibility of the parties' testimony, the court stated:
"Generally, the court finds the credibility of both [wife] and [husband] to be solid and good. Where the parties differed in their testimony, it was generally a result of a disconnect in their perceptions. * * * In assessing credibility, the court does find that [wife] did minimize her giving of hard and painful news to [husband] regarding the condition of the marriage. The court also finds [husband] to have been disingenuous in areas of his testimony. The court finds that [husband] was not candid about his knowledge of his wife's wealth. The court finds that [husband] was disingenuous about the potential binding nature of the legal contract that he executed on January 27, 1995. The court further finds that [husband] was disingenuous about his understanding and knowledge of wife's desire to remove him from her life. [Husband] is an intelligent person and too bright not to understand or know this."
The trial court found that, at the time the parties negotiated the separation agreement, husband made decisions that, at the time of dissolution, he wanted to "recall or minimize." The court also found that wife's parents did not intend husband to be a beneficiary of the trusts they established for wife, that wife did not intend husband to have an interest in the trusts, and that any commingling of wife's trust assets was "de minimus."
The trial court concluded that the parties intended the separation agreement to apply at dissolution, noting that husband's own proposed three-step process was premised on his understanding that a separation judgment could be quickly converted to a dissolution judgment. The court also concluded that the parties did not rescind the agreement; the court found that, "in the fall of 1994 and culminating with the signing of the Separation Agreement on January 27, 1995, the parties had undergone a de facto dissolution" and both sides relied on the agreement in the years that followed. And the court *640 concluded that the property division under the separation agreement fell within the "acceptable range" for "just and proper" divisions under ORS 107.105(1)(f) and did not violate the law or contravene public policy for the purposes of ORS 107.104(1)(b).
On appeal, husband renews the three arguments he made in the trial court. We address husband's arguments in turn and, for the reasons explained below, conclude that (1) the parties intended the separation agreement to control the division of their property at dissolution, (2) they did not rescind the agreement by their conduct during their separation, and (3) the agreement does not violate the law or contravene public policy.
Husband's first argument is that the trial court misinterpreted the separation agreement. Specifically, husband argues that the trial court erred by concluding, based on extrinsic evidence, that the parties intended the agreement to control the division of their property at dissolution.
To interpret a separation agreement that has been incorporated into a separation judgment, a court first examines the text of the agreement. Patterson I, 206 Or.App. at 348, 136 P.3d 1177. If the text is ambiguous, the court considers extrinsic evidence of the parties' intentions. Id. And, if the extrinsic evidence is ambiguous, the court applies maxims of construction. Id.
Like the trial court on remand, we conclude that the extrinsic evidence establishes that the parties intended the separation agreement to control the division of their property at dissolution. The letters between husband and Platt are particularly persuasive. Because they were written at the time the parties were negotiating the separation agreement, they are the best evidence in the record of the parties' intent at that time.
The letters establish that husband knew that wife wanted to resolve their property issues. The October 19, 1994, letter from Platt to husband is explicit. Platt wrote, "The property issues need to be resolved at this time. I've explained to [wife] that issues surrounding the children, including child support, are always subject to modification under Oregon law if and when circumstances change in the future." (Emphasis added.) Platt's statement that the property issues needed to be resolved, paired with her statement that other issues could be modified later, indicates that the property issues needed to be resolved permanently.
Although Platt's statement could be understood to mean that the property issues needed to be resolved for the duration of the separation, not for all time, husband's response to Platt's letter forecloses that understanding. As described, husband proposed a three-step process: "A formal agreement now, a lawsuit and court-ordered separation possibly later, and the quick conversion of that into a divorce order possibly after that[.]" Husband's proposed process establishes that husband understood that dissolution was possible and that, if the parties separated pursuant to a separation judgmentas they eventually didthe separation judgment could be quickly converted into a dissolution judgment.
Notably, there is no indication that the parties anticipated litigating their property division issues at dissolution. To the contrary, Platt informed husband that wife needed to "have some sense of order and finality," and husband informed Platt that he did not think that "any significant property issues could be resolved differently than you propose." Husband, a lawyer, did not suggest any alternate division of the property or assert, in any manner or at any point, that the division would not be final, as he knew wife wanted it to be.
As mentioned, at the trial on remand, husband testified that he did not intend the separation agreement to apply at dissolution and, if he had, he would not have limited his investigation into wife's financial assets as he did. But we defer to the trial court's finding, based on its assessment of husband's credibility, that husband's knowledge of wife's assets and her intentions with respect to their marriage was greater than he admitted in his testimony.
Thus, interpreting the parties' separation agreement in light of the extrinsic evidence, we conclude that the parties intended the *641 property division under the agreement to apply at dissolution; they did not intend to reconsider the division at dissolution.
We turn to husband's second argument: that the parties rescinded their separation agreement by their conduct, specifically, by living together and commingling their financial resources. Husband argues that the parties "only partially followed the 1995 separation agreement" and "[m]ore importantly, they continued to act as married peoplesharing a residence, sharing expenses, traveling together, [and] maintaining a family life."
Parties that have entered an agreement to keep their property separate can rescind the agreement by conduct that demonstrates a "mutual intent to no longer be bound by [the agreement's] terms." Baxter and Baxter, 139 Or.App. 32, 37, 911 P.2d 343, rev. den., 323 Or. 483, 918 P.2d 847 (1996). For example, in Baxter, we held that a husband and wife rescinded their prenuptial agreement to keep their property separate when they worked together to turn the husband's business into a profitable venture. Id. at 38, 911 P.2d 343. In Baxter, the wife quit her job and worked for the business without pay, cosigned promissory notes for the business, and used her retirement funds to pay the business's debts. We held that such conduct "demonstrated mutual intent to rescind the [prenuptial] agreement[.]" Id. In contrast, in Greulich and Creary, 238 Or.App. 365, 375, 243 P.3d 110 (2010), we held that the parties did not alter their intent, as reflected in a prenuptial agreement, to keep their property separate where there was no evidence that the parties intended to pool their financial resources for their common benefit. Although the respondent had provided financial assistance to the petitioner, the respondent repeatedly stated that she intended to keep the property she brought into the relationship as her own, and consistently with that intent, the parties did not hold any joint property or accounts. Id. Given the absence of joint financial operations, we concluded that the evidence "[fell] short of demonstrating a mutual intention to abandon the understanding reflected in the prenuptial agreement." Id. (emphasis in original).
Here, wife argues that the separation agreement itself provides that the parties cannot rescind the agreement by their conduct. She notes that the agreement provides that "[n]o modification of this agreement shall bind either party unless reduced to writing and subscribed by both parties or ordered by a court" and that "[t]he failure of either party to insist upon strict performance of any provision of this agreement shall not be deemed a waiver of any right to insist upon strict performance of such provision or of any other provision of this agreement at any time." We need not determine the legal significance of the provisions on which wife relies because, even assuming that the parties could rescind the agreement by conduct, we conclude that they did not.
As described above, the parties lived together for approximately seven years after entry of the separation judgment, but they generally kept their finances separate. After the lease on the cabin expired, the parties each paid their own housing expenses. Specifically, husband paid wife rent when they lived at the Schnorenberg house, and husband and wife paid an equal amount of monthly rent when they lived at the apartment.
Although some of the parties' bank accounts and credit card accounts remained jointly titled, the parties did not use them together. Wife did not use the joint bank accounts at all and, to the extent that the parties used one of the two joint credit card accounts, they each paid their own charges. After the separation, the parties did not open any new joint accounts or make any major joint purchases.
In keeping with the separation agreement, the parties made independent financial decisions about the property they received under the agreement. Also in keeping with the agreement, they made separate contributions to their children's expenses. Most notably, husband withdrew funds from his retirement account to help pay for the parties' oldest son's medical expenses. That is significant because it establishes that the parties were not acting as partners for financial purposes; *642 they were not making decisions in their best interest as a couple. Instead, they abided by the separation agreement, and each contributed to their son's medical expenses even though husband had to use his retirement funds (and incur penalties and taxes) to do so.
The parties each contributed to daily household expenses, such as groceries, but there is no evidence that they pooled their financial resources or acted as if their resources were available to each other. To the contrary, wife's testimony was that, in 1995, she told husband that "everything is separate," and husband's testimony was that, after 1995, the parties used their own separate accounts to pay "for almost everything."
That the parties kept their financial affairs separate is confirmed by the testimony of their counselors, who worked with them during their separation. Husband's counselor, Siemens, testified that it appeared each of the parties relied on his or her own financial resources. Similarly, wife's counselor, Rexius, testified that it appeared wife had a final resolution with regard to property and financial matters and that wife and husband were already financially independent.
Based on the evidence of the parties' conduct during the separation, we conclude that the parties did not rescind the separation agreement. Although the parties lived together and, as husband emphasizes, engaged in family activities, they maintained separate financial lives in keeping with the agreement. There is no evidence of a mutual intent to abandon the understanding reflected in the separation agreement.
We turn to husband's third and final argument: that even if the parties intended the separation agreement to control the division of their property at dissolution and did not rescind it, the agreement is not enforceable under ORS 107.104(1)(b), which provides for full enforcement of marital settlements that are incorporated into judgments, "except when to do so would violate the law or clearly contravene public policy." Husband argues that dividing the parties' property in accordance with the agreement violates the law and contravenes public policy because the division violates ORS 107.105(1)(f), which provides that a dissolution court shall divide marital property in a manner that is "just and proper in all the circumstances."
To be clear at the outset, husband does not contend that the separation agreementwhich, as we have now held, was intended to control the division of the parties' property at dissolutionwas invalid when the parties entered into it. He does not contend, for example, that the agreement was the product of fraud, duress, or unconscionable action. Nor does he contend that the property division under the agreement was not "just and proper" at the time of separation.
Instead, husband argues that, given the changes in the parties' relative financial situations between separation and dissolution, using the separation agreement to divide the parties' property at dissolution results in a property division that is "outside the range of what is `just and proper'" under ORS 107.105(1)(f). Husband points out that wife's trust assets grew from approximately $700,000 at the time of separation to $6.4 million at the time of the first dissolution trial. He also points out that, during the same period, he exhausted his retirement account and incurred credit card debt. He asserts that using the separation agreement to divide the parties' property at dissolution leaves him "a net worth that may well be negative," while it leaves wife a net worth of millions of dollars.
In support of his argument, husband points to cases in which separate assets of one spouse have been awarded to the other spouse in order to achieve a just and proper property division. Olson and Olson, 218 Or. App. 1, 178 P.3d 272 (2008); Gano-Ridge and Ridge, 211 Or.App. 393, 155 P.3d 84, adh'd to as modified on recons., 213 Or.App. 235, 159 P.3d 1292 (2007); Niman and Niman, 206 Or.App. 259, 136 P.3d 105 (2006); Becker and Becker, 122 Or.App. 567, 858 P.2d 480, rev. den., 318 Or. 60, 865 P.2d 1296 (1993). According to husband, those cases establish that, where one spouse has inherited substantial financial assets and the other has not but has otherwise contributed to the marital estate, it is normally just and proper for the noninheriting spouse to receive a *643 share of the inherited property, particularly if, without a share, the spouse would leave the marriage with few or no assets.
In response, wife argues that the test for whether the property division under the parties' separation agreement violates law or public policy under ORS 107.104(1)(b) is not whether the division is just and proper for the purposes of ORS 107.105(1)(f). Instead, she argues that parties can agree to a property division other than one that a court could order absent an agreement by the parties. Alternatively, wife argues that the property division was just and proper under ORS 107.105(1)(f).[4]
Thus, this case requires us to determine the relationship between ORS 107.104(1)(b), which provides that courts are to enforce the terms of marital settlement agreements "to the fullest extent possible, except when to do so would violate the law or would clearly contravene public policy," and ORS 107.105(1)(f), which provides that courts are to divide parties' property at dissolution in a manner that is "just and proper in all the circumstances."
As described above, 242 Or.App. at 458-59, 255 P.3d at 637-38, we addressed the relationship between the statutes in Patterson I in response to husband's argument that, if, on remand, the trial court determined that the parties intended the separation agreement to control the division of their property at dissolution, then the court had to determine whether the division was just and proper under ORS 107.105(1)(f). Observing that ORS 107.104(1)(b) "establishes a strong policy in favor of the enforcement of settlement agreements that have been reduced to judgment in the context of separation and dissolution disputes," we held that if, on remand, the court determines "that the parties intended their agreement to apply in the context of a dissolution, it will need to address whether enforcement of its terms would violate the law or clearly contravene public policy." 206 Or.App. at 351-52, 136 P.3d 1177.
Thus, in Patterson I, we implicitly rejected husband's argument that property divisions necessarily violate the law and contravene public policy for the purposes of ORS 107.104(1)(b) if they are outside of the range of just and proper divisions that a trial court could order under ORS 107.105(1)(f). For the reasons explained below, we now do so explicitly.
We begin our analysis with a review of the relevant law regarding marital settlement agreements. Oregon law encourages such agreements, both to decrease litigation and to remove dissolution proceedings from the adversarial process. McDonnal and McDonnal, 293 Or. 772, 778, 652 P.2d 1247 (1982) (explaining that Oregon's change to "no fault" divorce in 1971 was intended to decrease "excessive use of court time in litigating cases under the then existing fault provisions" and foster dispute resolution through "agreement at the initiation of the divorcing parties"). Parties "may and often do enter into separate agreements regarding the terms of the dissolution," and a trial court "is not obligated to approve such agreements; they always are subject to the court's review for fairness and equity under the circumstances." McInnis and McInnis, 199 Or.App. 223, 230, 110 P.3d 639, rev dismissed, 338 Or. 681, 115 P.3d 246 (2005) (internal quotation marks omitted). But, once approved by the court, "`agreements entered into by the parties are to be enforced as a matter of public policy.'" Id. (quoting McDonnal, 293 Or. at 779, 652 P.2d 1247).
The Supreme Court has explained that public policywhich was codified at ORS 107.104(1)(b) in 2001[5]both in terms of freedom to contract and fairness. In McDonnal, the court enforced a provision of a marital settlement agreement that had been incorporated *644 into a dissolution judgment and that provided that spousal support could be reconsidered even if there had not been a change in the parties' financial circumstances that would justify reconsideration under the statute governing the modification of support. The court explained:
"Once approved by the court and incorporated into the decree, agreements entered into by the parties are to be enforced as a matter of public policy.
"`It is axiomatic that public policy requires that persons of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice; and it is only when some other overpowering rule of public policy intervenes, rendering such agreements unfair or illegal, that they will not be enforced.'"
McDonnal, 293 Or. at 779, 652 P.2d 1247 (quoting Feves v. Feves, 198 Or. 151, 159-60, 254 P.2d 694 (1953)). The court further explained:
"Where parties have foregone their opportunity to litigate disputes and have chosen instead to enter into an agreement their reliance on the agreement can be presumed. Inequity may result if this court adopts a policy of less than full enforcement of mutually agreed upon property and support agreements."
Id.
Here, husband argues that enforcement of the separation agreement would violate the law and contravene public policy because the property division under the agreement is, according to husband, "outside the range of what is `just and proper'" under ORS 107.105(1)(f). We need not decide whether the property division is outside the range of what is just and proper under ORS 107.105(1)(f), because, even assuming that it is, that fact would not render the separation agreement illegal or clearly contrary to public policy.
As we have repeatedly held, the fact that a marital settlement agreement contains terms other than those that a court could order absent the agreement does not necessarily mean that the agreement violates the law or is clearly contrary to public policy. Edwards and Edwards, 73 Or.App. 272, 698 P.2d 542 (1985), is illustrative. In Edwards, we held that a provision in a settlement agreement that provided that the wife's spousal support would terminate automatically on the wife's "remarriage or cohabitation with a member of the opposite sex" was enforceable. Id. at 274, 698 P.2d 542. In doing so, we rejected the wife's argument that
"conditioning termination of spousal support on the supported spouse's cohabitation, without evidence that the living arrangement has altered that spouse's financial needs, violates public policy, because the supported spouse has no economic security in the event her cohabitant dies or abandons the relationship and, in either of those events, she may become a public charge."
Id. at 275-76, 698 P.2d 542. We explained that "a provision for automatic termination of spousal support conditioned on remarriage or cohabitation by the supported spouse, if imposed by the trial court, would be unenforceable," but, "when the parties voluntarily enter into a property and support agreement, and the agreement is approved by the court and incorporated into the decree, countervailing principles of public policy prevail and the parties' agreement generally will be given effect." Id. at 276, 698 P.2d 542. We further explained:
"Here, the provision for termination of spousal support on wife's `cohabitation with a member of the opposite sex' was not imposed by the court, but was part of the property settlement agreement of the parties. Although we might question the wisdom of including such a provision in a property settlement agreement, we conclude that, under the facts of this case, the provision is enforceable."
Id. (footnote omitted). See also McInnis, 199 Or.App. at 240, 110 P.3d 639 (marital settlement agreement in which the spouses waived their statutory right to modification of spousal support was enforceable); Eidlin and Eidlin, 140 Or.App. 479, 484, 916 P.2d 338 (1996) (marital settlement agreement *645 that provided a more permissive basis for seeking modification of spousal support than the applicable statute was enforceable); Pope and Pope, 73 Or.App. 242, 248, 698 P.2d 518 (1985), aff'd, 301 Or. 42, 718 P.2d 735 (1986) (marital settlement agreement that provided that the husband would pay the wife spousal support until a specified date was enforceable even though, absent the agreement, the trial court could have terminated the support based on the wife's improved financial situation).
Similarly, in Reeves and Elliott, 237 Or. App. 126, 238 P.3d 427 (2010), we held that a provision of a stipulated dissolution judgment that required the father to pay child support until the parties' twin sons were 23 years old was enforceable under ORS 107.104(1)(b). In doing so, we rejected the father's argument that, "insofar as the original stipulated judgment provides for support after the twins turn 21, it exceeds the authority of the court to award support under ORS 107.108." Id. at 130, 238 P.3d 427. We held that, even assuming a trial court could not order the support until the children turned 23, "such a limitation on the court's authority would not establish that an agreement to provide such support violates the law or contravenes public policy." Id. We noted that the statute authorizing support "neither forbids the parties from agreeing to such support nor states any public policy against doing so." Id. at 131, 238 P.3d 427.
The same is true here. ORS 107.105(1)(f) governs a trial court's authority to divide property at dissolution absent an agreement by the parties. It does not preclude parties from agreeing to a different property division, and it does not state any public policy against doing so. Thus, husband's argument, which is based on ORS 107.105(1)(f), is unavailing.
Given the strong public policy, stated in ORS 107.104, in favor of marital settlement agreements and full enforcement of those agreements, and the absence of any identified countervailing law or public policy, we conclude that the parties' separation agreement controls the division of their property at dissolution.
It is undeniably true that the division leaves the parties in dramatically different financial situations. But that, in and of itself, does not violate public policy. The parties struck a bargain. Husband may have had the best intentions when he made the bargain, and the differences in the parties' financial positions may not have been as great at the time, but the fact that, after the parties agreed to divide their property and proceeded according to that division, wife's financial position improved significantly and husband's declined significantly, does not mean that the bargain can be undone. To be sure, it appears that husband contributed a greater portion of his financial assets to the family than wife, both during the marriage and the separation, butfor whatever reasons, which may have included a desire for family cohesion and hopes of marital reconciliationthat is what he agreed to do, and we have no basis to not enforce that agreement.
Affirmed.
NOTES
[1] Husband also appeals the trial court's denial of his request for attorney fees. We reject his arguments regarding the fees without discussion. Initially, wife cross-appealed the trial court's denial of her request for attorney fees, but she later withdrew her cross-appeal.
[2] ORS 19.415 was amended by Senate Bill 262 (2009). Or. Laws 2009, ch. 231, §§ 2, 3. The amendments apply to appeals in which the notice of appeal was filed on or after June 4, 2009. Because the notice of appeal in this case was filed before that date, the amendments do not apply.
[3] We state the facts based on our review of the record and consistently with the trial court's credibility findings.
[4] Wife also argues that husband waived his right to argue, or is estopped from arguing, that the property division under the separation agreement violates the law and contravenes public policy because the agreement includes provisions regarding the fairness of the agreement. Because we conclude that the property division does not contravene the law or violate public policy, we do not address wife's waiver and estoppel arguments.
[5] ORS 107.104 "applies to marital annulment, dissolution or separation decrees entered before, on or after the effective date of this 2001 Act." Or. Laws 2001, ch. 203, § 3. The effective dated was May 25, 2001. Id. § 10.